**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 4 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

### UNITED STATES COURT OF APPEALS

### TENTH CIRCUIT

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

EVERETT LEE CAVELY,

        Defendant - Appellant.

No. 01-5165

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**
**(D.C. No. 00-CR-156-K)**

Everett R. Bennett, Jr. (Michael Shiflet with him on the brief), Frasier, Frasier & Hickman, LLP, Tulsa, Oklahoma, for the Defendant-Appellant.

Chad A. Greer, Assistant U.S. Attorney (David E. O'Meilia, United States Attorney, with him on the brief), Tulsa, Oklahoma for the Plaintiff-Appellee.

Before **HENRY** and **McKAY**, Circuit Judges, and **BROWN**,[*] District Judge.

**BROWN**, District Judge.

---

[*]Honorable Wesley E. Brown, U. S. Senior District Judge for the District of Kansas, sitting by designation.

Defendant-Appellant Everett Lee Cavely was charged with several other individuals in a ten-count, second superseding indictment. The charges included conspiracy to manufacture and manufacturing more than 50 grams of methamphetamine, possessing a firearm in furtherance of a drug-trafficking crime, and maintaining a location for the purpose of manufacturing a controlled substance. Appellant was found guilty by a jury on seven counts and was sentenced to a total of 440 months' imprisonment. In this direct appeal, Cavely challenges various aspects of the district court's rulings, including its denial of his motion to suppress evidence, its admission and exclusion of evidence at trial, its instructions to the jury, and its application of the federal sentencing guidelines.

I.

Appellant first contends the district court erred by denying his motion to suppress evidence, which challenged three separate searches by law enforcement officers. The first of these challenged searches occurred on October 14, 1999, when appellant executed a written consent form allowing Tulsa police officers to search a warehouse building jointly owned or leased by appellant and an individual named Ricky Lynn Massey. Appellant claims his consent was involuntary because it was obtained through deception. He claims he told police he would agree to a search only if the co-owner, Mr. Massey, also consented, and that officers falsely told him Massey had already consented. In support of this claim, appellant relies upon the written consent forms executed by both he and Massey on the night of the search. Appellant's consent form bears a handwritten

-2-

time of "8:15 P.M.," while Massey's form says "8:23 pm." Aple. App. at p. 1247-48.

The record of the suppression hearing shows that on the evening of October 14, 1999, Tulsa police officers went to appellant's residence, located at 2039 E. 13th Place, to execute a search warrant. They encountered Ricky Massey at the residence. Meanwhile, other officers staked out Massey and Cavely's jointly-owned warehouse at 3311 W. Charles Page Boulevard. Appellant was known to be in the warehouse at the time. Officer John Wilson, who was involved in the search of the residence, testified that during that search Massey consented to a search of the warehouse. Aple. Vol. 1 at 12. Wilson testified that Massey signed the written consent-to-search form in his presence and that Massey was the one who wrote down the time. (The form contained spaces for "time" and "date" next to the individual's signature.) The officer testified he could not say if the time recorded by Massey was correct. Wilson said that after obtaining Massey's consent, he radioed Officer Travis Ludwig, who was staking out the warehouse, and told him Massey had consented to a search of the warehouse. Id. at 13. Wilson testified that he told Ludwig to approach appellant and to attempt to get his consent. Id. at 14. Officer Ludwig confirmed this account and testified he did not approach appellant until after he received the foregoing message from Wilson. Id. at 18. He testified that appellant signed the consent form after being told that Massey had already consented. Id. at 19-20. According to Ludwig, appellant filled in the time and date on his consent form.

The district court rejected appellant's claim of deception and concluded that

appellant's consent was voluntarily given. The court noted there was no evidence to show that the times written on the forms were accurate, and said that the officers' testimony clearly established that they did not obtain consent from appellant until after they had obtained it from Ricky Massey. Aple. Vol. 1 at 65. The district court thus credited the officers' testimony as to the sequence of events. In reviewing a motion to suppress, this court accepts the district court's factual findings unless they are clearly erroneous. United States v. Bustillos-Munoz, 235 F.3d 505, 511 (10th Cir. 2000). Determinations of witness credibility are subject to review under this standard, as is a finding that consent was voluntarily given. See United States v. Flores, 48 F.3d 467, 468 (10th Cir. 1995); United States v. Orrego-Fernandez, 78 F.3d 1497, 1505 (10th Cir. 1996). The consent issue was obviously decided by the district court based on an assessment of the witnesses' credibility. Given the substantial support in the record for the district court's finding, that determination was not clearly erroneous.

The second incident challenged by appellant occurred on December 17, 1999, when Tulsa police officers went to appellant's residence. According to the testimony of the officers involved, they were looking for a woman for whom they had an outstanding arrest warrant. The officers knew that the woman was the girlfriend of a former associate of appellant's and was a methamphetamine user, but otherwise they had no reason to believe she would be at appellant's residence. Two officers went to the front door of the house, while a third officer went around towards the back. The two officers in front

smelled a chemical odor which they associated with a possible methamphetamine lab. Aple. Vol. 1 at 27. They knew that a search warrant involving methamphetamine had previously been executed at the residence. The officer approaching the back part of the house saw a man standing near the open door of a detached garage. The man went into the house through the back door of the residence. The officer, by looking through the open door of the detached garage, could see several items associated with the manufacture of methamphetamine. Id. at 28. The officers knocked on the front door of the house but no one answered. They subsequently obtained a search warrant based upon their observations at the house. They found evidence of methamphetamine manufacturing in the house when they executed the warrant.

Appellant argues that the officers violated his Fourth Amendment rights in connection with this search. In both the district court and on appeal, he has focused his argument on whether or not the police had reasonable grounds to believe that the woman named in the arrest warrant would be at his residence. The district court consequently addressed that issue, finding that the circumstances "would have perhaps associated [the woman] with this property," and that "once [the officers are] on the property lawfully, then personal observations of the officers" were sufficient to establish probable cause for the warrant, including observations of chemical equipment, glassware and tubing "all in plain sight, plain view of the backyard...." Aplt. App. Vol. II at 202. Appellant argues this finding was erroneous because "[t]he officers had no viable information that would

lead them to believe that [the woman] would be at the residence...." Aplt. Br. at 12.

Whether or not the police had such information, however, is not dispositive of whether they engaged in an unlawful search under the Fourth Amendment. Under the circumstances, the officers would have had no authority to search appellant's home even if they had reason to suspect that the woman named in the arrest warrant might be there. Steagald v. United States, 451 U.S. 204, 205-06 (1981) (absent exigent circumstances or consent, law enforcement officers may not legally search for the subject of an arrest warrant in the home of a third party without first obtaining a search warrant). The same rule would apply to a search of the curtilage of the home. See United States v. Dunn, 480 U.S. 294, 301 (1987) (curtilage is the area so intimately tied to the home itself that it should be placed under the home's umbrella of Fourth Amendment protection). Thus, the material issue is not whether the officers had reason to believe that the woman might be at appellant's house; it is whether their entry upon appellant's property and their observations thereon constituted a "search" within the meaning of the Fourth Amendment.

The protections of the Fourth Amendment may extend beyond the home itself. The curtilage of a house -- the area that harbors "the intimate activity associated with the 'sanctity of a man's home and the privacies of life'" -- is likewise protected by the Fourth Amendment. United States v. Dunn, 480 U.S. 294, 300 (1987). Appellant arguably invokes the curtilage doctrine when he asserts that the officers "wrongfully entered [his]

property" and thereby engaged in a warrantless search in violation of the Fourth Amendment. Aplt. Br. at 13-14. The problem with this argument, however, is that appellant made no showing that he possessed a legitimate expectation of privacy that was violated by the officers' actions. A determination of whether a particular area lies within the curtilage depends upon a number of facts and factors, including "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." Dunn, 480 U.S. at 301. The record before us contains no evidence on these matters, and appellant did not ask the district court to make any findings with respect thereto. The courts have consistently held that the burden of establishing a legitimate expectation of privacy is on the party claiming a Fourth Amendment violation, see United States v. Rascon, 922 F.2d 584, 587 (10th Cir.1990), cert. denied, 111 S.Ct.2037 (1991), and we have applied that same rule to a claimed invasion of the curtilage. Fullbright v. United States, 392 F.2d 432, 435-36 (10th Cir. 1968). See also Florida v. Riley, 488 US 445, 455 (1989) (O'Connor, J., concurring) ("In my view, the defendant must bear the burden of proving that his expectation of privacy was a reasonable one, and thus that a 'search' within the meaning of the Fourth Amendment even took place."). Appellant has failed to meet that burden here. Absent a showing that the officers' entry on the property violated a reasonable expectation of privacy, their actions did not amount to a "search" under the

Fourth Amendment and their observations were a proper basis for a search warrant.  Cf. Kyollo v. United States, 533 U.S. 27, 33 (2001) ("a Fourth Amendment search does not occur--even when the explicitly protected location of a house is concerned--unless 'the individual manifested a subjective expectation of privacy in the object of the challenged search,' and 'society [is] willing to recognize that expectation as reasonable.'").  See also United States v. Dunn, 480 U.S. 294, 304 (1987) (warrantless observation of barn on defendant's property occurred outside the curtilage and was constitutionally permissible); Oliver v. United States, 466 U.S. 170, 183 (1984) (the law of trespass forbids intrusions upon land that the Fourth Amendment does not proscribe).  The district court therefore did not err in denying appellant's motion to suppress the evidence obtained on December 17, 1999.[1]

The third search challenged by appellant occurred on June 13, 2000, when Tulsa police officers went to appellant's house to arrest him.  The officers had a warrant for the arrest based on evidence of methamphetamine previously found at the house.  A total of four officers were involved.  Two officers went to the front of the house and two went to the back.  The officers knew that firearms had been found during a prior search of the house.  Two officers knocked on the front door several times, but no one answered.  Aple.

---

[1] This is not a case of plain error.  See Fed.R.Crim.P. 52(b).  The mere fact that officers went to the front and around towards the back of appellant's house, standing alone, does not establish an invasion of the curtilage.  See e.g., United States v. French, 291 F.3d 945, 952-55 (7th Cir. 2002).

Vol. 1 at 47. One of the officers in the back saw appellant come out of the back door of the house and walk towards the detached garage. He was carrying two cans of Coleman fuel, a product sometimes used to manufacture methamphetamine. The officers arrested appellant on the driveway just outside of the back door of the residence. They searched him, finding over $4,000 in cash and a quantity of methamphetamine on his person. When they asked if anyone else was in the house, appellant told them he had "a friend" inside. The officers asked if they could go in the house and bring out the friend, to which appellant replied, "If you holler, he'll come out." At that point, officers entered the house through the back door and announced their presence, but they received no response. As they entered, they could smell an odor that they associated with the manufacture of methamphetamine. They came into the kitchen and saw Mason jars with liquid in them and a white powdered substance on the counter. They proceeded through the house and found a man in the living room, and they brought him outside. Officers went briefly through each room in the house to see if anyone else was present. They saw additional incriminating evidence but found no one else. They were in the house for approximately ninety seconds. They later obtained a search warrant based in part upon their observations from inside the residence. The incriminating items in the house were seized when the search warrant was executed. The officers testified that they conducted the sweep out of concern for their safety. They also testified that appellant consented to the sweep. The district court apparently rejected the claim of consent, but found that the

sweep was nevertheless justified by safety concerns. Aple. Vol. 1 at 67-68.

"A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." Maryland v. Buie, 494 U.S. 325, 327 (1990). Such a search is limited to a "cursory visual inspection of those places in which a person might be hiding." Id. It is constitutionally permissible if the officers had "a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[ed] the officer in believing that the area swept harbored an individual posing a danger to the officer or others." Id. In finding that the officers' actions in this case constituted a valid protective sweep, the district court stated:

> There's no question, it was admitted by Mr. Cavely at the scene there was someone inside the house. And there was evidence, and there had been previous evidence that this house had been used in a drug transactions [sic] and for cooking methamphetamine.
> Mr. Cavely had Coleman fuel in his hands at the time of his arrest. He had methamphetamine on his person. There have been previous incidents where this house had been searched where there were firearms.
> Even though it's a close question, I think it's sufficient for the officers to be concerned with their own safety.
> Perhaps, as Mr. Cavely suggested, hollering for that person to come out would have been the best way to proceed, but I think the officers do have to be concerned about someone in the house who has not come out of the house even though there's all this activity taking place outside, and at a place where these things, as indicated, are known to the officers.

Aplt. App. Vol. I at 68. Appellant argues this conclusion was erroneous because a

-10-

"protective sweep" is limited to arrests occurring inside a home and because the officers' entry into the house was merely a pretext to search for drugs.

Although it is true that Buie involved an in-home arrest, courts have recognized that the same exigent circumstances present in Buie can sometimes accompany an arrest just outside of a residence or other structure. Depending on the circumstances, the exigencies of a situation may make it reasonable for officers to enter a home without a warrant in order to conduct a protective sweep. See e.g. United States v. Soria, 959 F.2d 855 (10th Cir. 1992) (police search of nearby auto body shop after arresting the owner was a valid protective sweep); United States v. Oguns, 921 F.2d 442, 446-47 (2nd Cir. 1990); United States v. Wilson, 306 F.3d 231, 238 (5th Cir. 2002) (sweep reasonable where suspect arrested just outside entry); United States v. Colbert, 76 F.3d 773, 776-77 (6th Cir. 1996) (protective sweep for arrest just outside home may be justified); United States v. Henry, 48 F.3d 1282, 1284 (D.C. Cir. 1995) (Buie rationale applicable to arrest just outside home); United States v. Kimmons, 965 F.2d 1001 (11th Cir. 1992). Cf. Minnesota v. Olson, 495 U.S. 91, 100 (1990) (warrantless intrusion may be justified by hot pursuit of a fleeing felon, imminent destruction of evidence, the need to prevent a suspect's escape, or the risk of danger to the police or to other persons inside or outside the dwelling).

Given the circumstances confronting the officers in this case, we agree with the district court that the officers' entry and cursory visual search of the residence was

reasonable under the Fourth Amendment. The evidence showed specific facts that would warrant a reasonable officer to believe that appellant's home harbored an individual posing a danger to the officers or others on the arrest scene. Among other things, the officers had a clear indication of on-going methamphetamine production at the house. They knew appellant was in possession of a large amount of cash and methamphetamine. They knew that appellant's house had previously been used to manufacture methamphetamine and that appellant had just come out of the house carrying an explosive fuel sometimes used to manufacture methamphetamine. Cf. United States v. Walsh, 299 F.3d 729, 734 (8th Cir. 2002) (noting well-documented hazards of methamphetamine manufacture, including risk of explosion of volatile chemicals); United States v. Erb, 596 F.2d 412, 418 (10th Cir.) (same), cert. denied, 444 U.S. 848 (1979). Moreover, appellant admitted he had "a friend" inside the house, but the friend did not appear or answer when officers knocked on the front door. The officers also knew that firearms had been found in the house during a prior search. They were just outside of the back door in an area where they could have been vulnerable to an attack from someone inside. There was no evidence that the officers entered the house merely for the purpose of gathering incriminating evidence. Under these circumstances, the officers had a compelling interest in assuring themselves that the house was not harboring other persons who posed a danger to them. Cf. Buie, 494 U.S. at 333. In response, they engaged in a cursory visual inspection of the areas of the house where a person could be found. We find that this

search was reasonable under the Fourth Amendment.

## II.

Appellant next contends that the district court made erroneous rulings at trial. He first argues the court erred by denying his motion for mistrial after a police officer with specialized training on methamphetamine laboratories testified that certain items recovered from appellant's auto repair shop contained methamphetamine residue. The district court twice sustained objections to such statements on the grounds that the officer was not a chemist and was not qualified to say whether the residue was in fact methamphetamine or some other substance. Appellant contends that a mistrial should have been granted because this witness improperly injected prejudicial "evidentiary harpoons" [2] into the trial.

"A trial court may appropriately grant a mistrial only when a defendant's right to a fair and impartial trial has been impaired; a decision we review for an abuse of discretion." United States v. Caballero, 277 F.3d 1235, 1242 (10th Cir. 2002) (citing United States v. Gabaldon, 91 F.3d 91, 93-94 (10th Cir. 1996)). The district court certainly did not abuse its discretion in denying a mistrial here. The district court gave an appropriate, timely, and clear instruction explaining why the jury should disregard the

---

[2] In United States v. Hooks, 780 F.2d 1526, 1535, n.3 (10th Cir. 1986), we explained that an "evidentiary harpoon" is a metaphorical term used to describe an attempt by a government witness to deliberately offer inadmissible testimony for the purpose of prejudicing the defendant.

witness's unsupported identification of the substance. Aple. App. at 435-36. This was sufficient under the circumstances to protect against unfair prejudice. Moreover, in view of the overwhelming evidence that this lab and others were set up to manufacture methamphetamine -- including a stipulation by appellant that numerous items seized by the police were chemically tested and were found to contain methamphetamine, see Aple. App. Vol. 7 at 1,244 -- appellant's right to a fair trial was not affected by this witness's improper statements.

Appellant next contends the district court erred by permitting the government to have an expert witness give an estimate of the amount of methamphetamine that was, or could have been, produced by the four meth labs found by the police in this case. As part of its case-in-chief, the government presented testimony from John Paulson, a forensic scientist with the Tulsa Police Department's Forensic Laboratory. Paulson estimated these labs' potential methamphetamine production by first examining police records showing the amount of precursor ingredients (specifically, pseudoephedrine at three of the labs) found or apparently used at each lab, and then by applying a "conversion percentage" to estimate the likely methamphetamine yield from that quantity of precursor under that particular method of production. Appellant argues Paulson's testimony was speculative and did not meet the standards of Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993).

The district court held a Daubert hearing to determine whether the challenged

-14-

testimony met the standards of Fed.R.Evid. 702. At that hearing, Paulson explained his method and the sources upon which he relied. After reviewing the record, we cannot say the district court abused its discretion by admitting this testimony. See General Elec. Co. v. Joiner, 522 U.S. 136 (1997) ("abuse of discretion is the proper standard by which to review a district court's decision to admit or exclude scientific evidence"). Paulson's testimony showed that his method utilized basic chemistry supplemented by specialized knowledge of methamphetamine production. The district court could properly conclude that this technique was commonly used by forensic chemists and was generally accepted within the field. Paulson's method was based on published articles, seminars and courses on clandestine laboratories, DEA literature, and Paulson's own experience as a forensic scientist. We note that this same method of estimating methamphetamine production has frequently been used with regard to sentencing issues. See e.g., United States v. Higgins, 282 F.3d 1261, 1279-80 (10th Cir. 2002); United States v. Becker, 230 F.3d 1224, 1226 (10th Cir. 2000). Appellant points out that Paulson's estimates were based on certain assumptions, and that the reliability of his estimates depended upon the validity of his assumptions. Appellant was able to fully cross-examine the witness about these assumptions, however, and we agree with the district court that these questions went to the weight of the evidence and not its admissibility.[3] The district court could properly

---

[3] The potential yield from the precursor chemicals found or used at the labs was obviously relevant to prove the quantities of methamphetamine alleged in the indictment. We note that the government expert's opinion was not the only evidence of quantity,

find that the witness's method was sufficiently reliable to meet <u>Daubert</u> and to be admissible under Rule 702.

### III.

Appellant next argues the evidence was insufficient to support the verdict on Count Four, a firearm charge based on 18 U.S.C. § 924(c)(1)(B)(i), and that the district court improperly instructed the jury on this count in a manner that constructively amended the indictment. In sum, Count Four alleged that on October 14, 1999, the defendant knowingly possessed a semi-automatic assault weapon, to wit: an S.W.D. Cobray M12 .380 Auto caliber semiautomatic pistol, serial number 12-0005704, in furtherance of the drug-trafficking crimes alleged in Counts One and Three. Appellant claims there was no evidence to show that he possessed this particular firearm. He notes that the weapon was found by the police during a search of the warehouse shared by he and Ricky Massey, in an area allegedly leased to Massey, and he argues the government failed to show he exercised any dominion or control over the weapon. Aplt. Br. at 26.[4] The test for

_____

however; the government also offered eyewitness testimony from individuals involved in the scheme. For example, one witness testified that appellant produced methamphetamine two or three times a month, and that a "regular cook" yielded about 500 grams of pure methamphetamine. Aple. Vol. 1 at 85-87. <u>See also id</u>. at 185, 197 & 200; Vol. 3 at 476 (additional testimony as to the large amounts of methamphetamine manufactured).

[4] Appellee assumes appellant is claiming the government failed to show that possession of this firearm was "in furtherance of" a drug-trafficking crime. Aple. Br. at 32-37. As we understand it, appellant is claiming that the evidence was insufficient to show that he possessed the weapon. <u>See</u> Aplt. Br. at 26 ("Nothing showed that Everett

(continued...)

sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the prosecution, any rational jury could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979). Under this standard, a rational jury could have found that appellant constructively possessed this firearm. As an initial matter, circumstantial evidence suggested that appellant had access to, and control over, the area of the building where the Cobray firearm was found. Among other things, there was testimony that Ricky Massey had only recently begun to use the auto shop in October of 1999, that he did so at the invitation of appellant, and that his primary occupation at the time was in fact to sell methamphetamine for appellant. Aple. App. Vol. 1 at 183-85. Massey indicated that threats by a certain individual, who was a former associate of appellant in the methamphetamine business, prompted appellant to bring firearms to the shop for protection. Massey testified that he had seen the Cobray .380 [Government's Exhibit 116] all over the building, including in its gun case in appellant's office. Significantly, the evidence showed that appellant had specific knowledge of where this firearm was located when the police searched the building, despite the fact that the gun was then hidden from view on a shelf and was covered by a rag or magazine. Aple. Vol. 2 at 358. Appellant provided the precise location of the firearm when the police asked him if there were any weapons on the first floor. When

---

[4](...continued)
Cavely exercised any dominion on control over said weapon....”). Appellant's brief contains no argument relating to the “in furtherance of” element.

-17-

officers retrieved the weapon, appellant confirmed that this was the gun to which he was referring. At the time it was found, the gun contained a loaded high-capacity magazine and a round in the chamber. Appellant made this disclosure to the officers just after they had found an extensive methamphetamine laboratory on the second floor together with numerous other firearms. Some of these other firearms were loaded as well. Additional evidence was presented at trial establishing a link between appellant's possession of firearms and his manufacturing and selling of methamphetamine. Taken as a whole, the evidence was sufficient for the jury to find beyond a reasonable doubt that appellant constructively possessed the firearm listed in Count Four, and that he did so in furtherance of the drug-trafficking offenses charged in the indictment.

Appellant also contends the district court erred on Count Four by instructing the jury that the government only had to show that he "possessed *a* firearm" [italics added] in furtherance of one of the drug-trafficking counts. Appellant argues that this instruction constructively amended the indictment because it permitted the jury to convict for possession of a firearm other than the one charged in Count Four. He notes the evidence showed that he possessed numerous firearms during the period covered by the indictment. See United States v. Hornung, 848 F.2d 1040, 1046 (10th Cir. 1988) (a constructive amendment occurs when the terms of the indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is substantial likelihood that the defendant may have been

convicted of an offense other than that charged in the indictment).

Appellant did not object to the language of this instruction in the district court. Aple. Vol. 3 at 666-71; Vol. 5 at 1063. As such, our review is limited to determining whether its use constituted plain error. United States v. Fabiano, 169 F.3d 1299, 1302-03 (10th Cir. 1999).[5] Both parties' briefs have addressed the instruction issue without mentioning that in the course of the jury's deliberations, the jury sent a note to the judge asking precisely the question at issue. They asked: "Relative to Count 4, number one, are we to consider only the gun found downstairs on Charles Page [street] and that did not initially work in the police lab to determine guilt or innocence? Question 2, if the answer is yes, why can't the other guns be considered?" Aple. Vol. 6 at 1163. After consulting with counsel, the district court sent a response stating: "The answer to your first question is yes. The answer to your second question is that no other firearms were charged by the government in the indictment." Id. at 1166.

Under a plain error review, reversal is only warranted if there is: (1) an error; (2) that is plain or obvious; (3) that affects substantial rights; and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings. United States v. Cernobyl, 255 F.3d 1215, 1218 (10th Cir. 2001). Under the record before us, any potential error in

---

[5] We note that although the Seventh Circuit found a similar instruction to be a constructive amendment of the indictment in United States v. Leichtnam, 948 F.2d 370 (7th Cir. 1991), the same court recently held that use of the instruction did not warrant reversal under a plain error standard. See United States v. Algee, 309 F.3d 1011, 1016 (7th Cir. 2002).

the initial jury instructions was obviously cured by the district court's response to the jury's question. There is no substantial likelihood that the jury found appellant guilty of Count Four based on some weapon other than the one charged in the indictment. Cf. United States v. Mills, 29 F.3d 545, 548 (10th Cir. 1994).

Appellant's brief points out that when the Cobray .380 was tested by a forensic scientist it was found to be inoperable. Aplt. Br. at 25. It is not clear whether appellant intends this as an assertion that the evidence failed to show the object was a "firearm" within the meaning of § 924(c), but assuming he does, we reject it. The government's expert testified that the gun would not fire initially because it had been assembled improperly, with a hammer pin slightly protruding as a result of not being fully inserted into its slot. He indicated that the pin was something that could easily be taken off for cleaning and testified that, after a short reassembly of the weapon, it fired in semi-automatic fashion. Aple. Vol. 2 at 444-47. Under this testimony, the jury could properly find that this weapon was designed to, and could readily be converted to, expel a projectile by the action of an explosive. See 18 U.S.C. § 921(a)(2) (defining "firearm"). Appellant also makes a passing assertion that the evidence at trial failed to show that the firearm was a prohibited "semi-automatic assault weapon" within the meaning of § 924(c)(1)(B)(i). Aplt. Br. at 27. We reject this argument because a determination of whether a firearm is a prohibited assault weapon under this section is a sentencing factor and not an essential element of the offense that must be proven at trial. See United States

-20-

v. Avery, 295 F.3d 1158, 1171 (10th Cir. 2002) (citing cases).  Accordingly, we reject appellant's claims with respect to Count Four.

IV.

Appellant next complains that the district court erred by admitting testimony showing that when appellant was arrested on the indictment on December 15, 2000, the police found drugs, a loaded 9mm firearm, and a bullet-proof vest in his room.  Appellant did not object to this testimony when it was offered, Aple. Vol. 4 at 748-50, nor has he shown that the district court abused its discretion by admitting the evidence.  See e.g., United States v. Martinez, 938 F.2d 1078, 1083 (10th Cir.1991) (firearms are recognized as "tools of the trade" for drug distribution).

Appellant also contends he was denied a fair trial because the jury heard irrelevant and prejudicial testimony from Robert Bilyeu.  Bilyeu testified in the government's case-in-chief, but the district court later ruled that his testimony was irrelevant and instructed the jury to disregard it.  Among other things, Bilyeu testified that between August of 1999 and January of 2000, he cooked methamphetamine at his house or business on numerous occasions with Severett Cheek, who was named as a co-defendant in the instant indictment.  Other evidence showed that Cheek was involved with appellant in manufacturing methamphetamine.  In the course of  Bilyeu's testimony, the district court questioned whether the government could show that Bilyeu was tied in to the conspiracy alleged in the indictment or whether Bilyeu and Cheek had formed a separate conspiracy.

Aple. Vol. 3 at 580, 584. The government indicated it had another witness who could help "tie in" Bilyeu, but it decided not to call this witness after the district court raised these concerns. Aple. Vol. 5 at 1064. The district judge subsequently told the jury he had determined that Bilyeu's testimony concerned a separate and distinct situation, and he instructed the jury to disregard the testimony and not to consider it in their deliberations. Aple. Vol. 6 at 1088. After reviewing the record, we conclude that the district court's instruction was sufficient to prevent any unfair prejudice. As the district court noted, Bilyeu's testimony added little, if anything, to the abundant evidence otherwise produced against appellant. In light of the overwhelming evidence, there is no real possibility that the jury's verdict was affected by hearing Bilyeu's testimony. See Maestas v. United States, 341 F.2d 493, 496 (10th Cir. 1965) (error in the admission of evidence may be cured by withdrawing the evidence from the jury's consideration and instructing the jury to disregard it, unless the testimony is such that it will create so strong an impression on the minds of the jurors that they will be unable to disregard it in their consideration of the case, despite the admonishment).

Appellant's final evidentiary proposition is that the verdict must be reversed because it was based in part on testimony from individuals who benefitted from plea bargains with the government. The en banc decision in United States v. Singleton, 165 F.3d 1297 (10th Cir. ), cert. denied, 527 U.S. 1024 (1999), clearly rejects such an argument.

V.

Appellant raises two objections to the district court's application of the sentencing guidelines. First, he contends the court erred in its calculation of the amount of methamphetamine for which appellant was responsible under the guidelines. This is essentially a reassertion of his claim that the testimony of the government's forensic scientist, John Paulson, was unreliable under Daubert, and we reject it for the same reasons previously stated. Appellant also argues that the court erred by imposing a two-level increase in offense level under U.S.S.G. § 3B1.1(c) for being a "leader or organizer" of a criminal activity. We uphold such a factual determination by the sentencing court unless the ruling constituted clear error. United States v. Vanmeter, 278 F.3d 1156, 1166 (10th Cir. 2002). The district court's determination in this case was supported by the testimony of several witnesses at trial, as well as by physical evidence, and it did not constitute clear error.

VI.

The judgment of the district court is AFFIRMED.