FILED
**United States Court of Appeals**
**Tenth Circuit**

**March 3, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

JIMMY RAY PETTIT, a/k/a Black,

      Defendant - Appellant.

No. 13-7015
(D.C. No. 6:11-CR-00048-JHP-13)
(E.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

Before **KELLY**, **ANDERSON**, and **MATHESON**, Circuit Judges.

---

Jimmy Ray Pettit appeals his jury conviction and 135-month sentence for conspiracy to possess with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii), and 846. We exercise jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a) and affirm.

---

[*]    After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## I.    BACKGROUND

Pettit and thirteen others were charged in a one-count conspiracy indictment. The object of the conspiracy charged was to "knowingly and intentionally distribute and possess with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II controlled substance." R. Vol. 1 at 12. The other defendants pleaded guilty; Pettit went to trial. A jury convicted him of the conspiracy charge and returned a special verdict finding the amount involved in the conspiracy to be in excess of 500 grams of a mixture containing methamphetamine. *Id.* at 124.

Viewing the trial evidence in the light most favorable to the government, *see United States v. Cornelius*, 696 F.3d 1307, 1316 (10th Cir. 2012), the evidence established that Patrick Springwater headed an organization for distributing methamphetamine in northeastern Oklahoma. Springwater usually fronted the drugs to his distributors who would pay him after they had sold the drugs.

Springwater's sole source of supply during 2010 (and, perhaps, during 2009), and through the latter part of March 2011, was an Arkansas resident named Jose Ramirez-Mendoza. To obtain supplies of methamphetamine from Ramirez-Mendoza, members of Springwater's organization, or Springwater himself, would drive to Arkansas, usually twice a month, to pick up pound or kilogram amounts. However, in December 2010, Springwater was stopped in Arkansas by government agents, who seized one pound of methamphetamine from Springwater's car. Then, toward the end of March 2011, officers in Arkansas seized a kilogram of methamphetamine from a

car driven by members of Springwater's organization.  At that point, Springwater felt he could not immediately return to Ramirez-Mendoza for supply because Ramirez-Mendoza had not been paid for the drugs that had been seized.  Instead, Springwater asked his distributors if they knew of any alternative source.  One of those distributors, Walter "Mick" Pettit, stated that his Uncle Jim (the defendant, Jimmy Ray Pettit) might get a supply for him.

In April 2011, Pettit supplied two half-pound deliveries of methamphetamine to Springwater.  Springwater paid Pettit $8,000 for the first delivery, and $7,000 for the second.  The first batch was "brown" methamphetamine, which did not sell well, but the second batch was of better-quality "white" methamphetamine and it sold better.  Pettit and Springwater were planning a third delivery of one pound of methamphetamine when Springwater was arrested.  Springwater testified that he had intended to return to Ramirez-Mendoza as his supplier, although he did not explain what had changed relative to his unpaid debt to Ramirez-Mendoza that would permit him to do so.

## II.  CONSPIRACY CONVICTION

Pettit challenges the sufficiency of the evidence to sustain his conviction for conspiracy.  "To obtain a conspiracy conviction, the government must prove:  (1) an agreement by two or more persons to violate the law; (2) knowledge of the objectives of the conspiracy; (3) knowing and voluntary involvement in the conspiracy; and (4) interdependence among co-conspirators."  *United States v. Foy*, 641 F.3d 455, 465 (10th Cir. 2011).  Where, as here, a defendant is charged with a certain quantity

of drugs, "that quantity of drugs becomes an element of the charged offense if the quantity triggers a sentence beyond the maximum allowed for violation of the base § 841(a)(1) offense." *United States v. Montgomery*, 468 F.3d 715, 719 (10th Cir. 2006). Pettit asserts that the evidence of interdependence and drug quantity was insufficient to sustain his conviction.

"We review the record de novo in sufficiency-of-the-evidence challenges to criminal jury verdicts, asking if, viewing the evidence in the light most favorable to the government, a reasonable jury could have found the defendant guilty beyond a reasonable doubt." *Cornelius*, 696 F.3d at 1316 (internal quotation marks omitted). We consider "both direct and circumstantial evidence, and all reasonable inferences therefrom, in the light most favorable to the government." *United States v. Acosta-Gallardo*, 656 F.3d 1109, 1123 (10th Cir. 2011) (internal quotation marks omitted). "Under this standard, we will not reverse a conviction unless no rational trier of fact could have reached the disputed verdict." *United States v. Pulido-Jacobo*, 377 F.3d 1124, 1129 (10th Cir. 2004) (brackets, ellipsis, and internal quotation marks omitted). This court will not weigh the evidence or disturb the jury's credibility determinations. *Acosta-Gallardo*, 656 F.3d at 1123. "Because secrecy and concealment are essential features of successful conspiracy, direct evidence of conspiracy is often hard to come by. Therefore, conspiracy convictions may be based on circumstantial evidence, and the jury may infer conspiracy from the defendants' conduct and other circumstantial evidence indicating coordination and

- 4 -

concert of action." *United States v. Dazey*, 403 F.3d 1147, 1159 (10th Cir. 2005) (citation, brackets, and internal quotation marks omitted).

### A. Interdependence

"A defendant's activities are interdependent if they facilitated the endeavors of other alleged conspirators or facilitated the venture as a whole." *United States v. Ivy*, 83 F.3d 1266, 1286 (10th Cir. 1996) (internal quotation marks omitted). The government must submit "proof that the conspirators intended to act *together* for their *shared mutual benefit* within the scope of the conspiracy charged." *United States v. Hamilton*, 587 F.3d 1199, 1208 (10th Cir. 2009) (internal quotation marks omitted).

Pettit argues that interdependence was not proved because the government failed to show a common goal between him and his coconspirators. He contends (1) the evidence demonstrated that he made only $20 on the sales of drugs worth $15,000, so he was not motivated by profit; (2) the evidence did not show that he was motivated to gain access to drugs or to accept drugs as payment; (3) the evidence did not demonstrate that the conspiracy needed or depended on his participation to survive; and (4) he was involved for only two sales, while the conspiracy spanned two years, and his role was relatively minor given that he provided only a pound of methamphetamine to an organization that generally sold two pounds a month.

Even if Pettit had been a "financially selfless conspirator," he would not be "categorically exclude[d] from conspiracy liability." *Id.* at 1210 n.6. But the evidence demonstrated that Pettit did profit from the sales. He admits to receipt of

$20, and Springwater testified that he paid Pettit with an "8-ball," or 3.5 grams of methamphetamine, worth $300.

Moreover, a reasonable jury could have concluded that Pettit was motivated, at least in part, to help his nephew, who personally introduced Springwater to Pettit and who was present during the drug deliveries. *See id.* at 1210 & n.6 (rejecting defendant's claim that he did not personally profit financially from furthering his brother's illegal drug organization; stating assistance arising from "a familial sense of loyalty and obligation," did not immunize defendant from prosecution as a drug conspirator).

In addition, the evidence supported a jury finding that the conspiracy depended on Pettit's supply of drugs. It is undisputed that Springwater purchased drugs from Pettit because he could not obtain a supply from Ramirez-Mendoza. "[T]his evidence alone shows that [Pettit] facilitated the actions of the venture as a whole . . . [and he] was plainly integral to the success of the operation." *United States v. Hutchinson*, 573 F.3d 1011, 1036 (10th Cir. 2009); *see also Ivy*, 83 F.3d at 1286-87 (holding interdependence was shown by fact that one coconspirator received the majority of his supply from another coconspirator and held a prominent position in the supplier's organization).

Pettit cites no authority to support his argument that his relatively short involvement with the conspiracy precluded a finding of interdependence. We also reject his claim that his relationship with Springwater was merely that of a buyer and seller, not of coconspirators. He relies on *United States v. McIntyre*, 836 F.2d 467,

471 (10th Cir. 1987), for the proposition that "proof of the existence of a buyer-seller relationship, without more, is inadequate to tie the buyer to a larger conspiracy." But the buyer-seller rule does not apply where "each co-conspirator's activities constituted essential and integral steps toward the realization of a common, illicit goal." *United States v. Fox*, 902 F.2d 1508, 1514 (10th Cir. 1990) (internal quotation marks omitted). Here, the evidence was sufficient for a reasonable jury to find that Pettit provided large quantities of methamphetamine to be distributed by Springwater's organization. Thus, the evidence supports a conclusion that Pettit "did knowingly join and participate in the [methamphetamine] conspiracy." *Id.* at 1516. We therefore conclude that the evidence was sufficient to prove interdependence.

## B. Drug Quantity

We turn to Pettit's claim that the evidence was insufficient to prove that he was involved with more than 500 grams of a substance containing methamphetamine. He contends that only the two drug sales to Springwater can be counted, conceding that the two completed drug sales to Springwater involved 426.5 grams. It is undisputed that including the additional pound of methamphetamine contemplated in the third sale put the total attributable to Pettit well over the 500 grams for which he was convicted. He argues that the planned third sale for an additional pound of methamphetamine could not be included in the amount of drugs attributable to him because it was not an order, Springwater did not intend to buy from him again, there was no agreement to buy more, and Springwater stated that Pettit would not be involved further in the conspiracy.

"Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act." *United States v. Shabani*, 513 U.S. 10, 16 (1994) (internal quotation marks omitted). It is well-established that the inchoate crime of conspiracy punishes the agreement to commit an unlawful act, rather than the completed criminal act. *See United States v. Jimenez Recio*, 537 U.S. 270, 274 (2003). Therefore, the crime of conspiracy "may exist and be punished whether or not the substantive crime ensues." *Id.* (internal quotation marks omitted). And even "[w]here police have frustrated a conspiracy's specific objective but conspirators . . . have neither abandoned the conspiracy nor withdrawn, the[] special conspiracy-related dangers remain, [as does] the essence of the conspiracy—the agreement to commit the crime." *Id.* at 275. Pettit was convicted of violating 21 U.S.C. § 846, which provides that any person who "conspires to commit any offense defined in [the subchapter addressing controlled substances] shall be subject to the same penalties as those prescribed for the offense" that was the object of the conspiracy.

Springwater testified that he probably would have purchased the additional pound of methamphetamine from Pettit "if the quality was good." R. Vol. 2 at 180-81. He further stated that if he had not been arrested, he would have continued to sell drugs. *Id.* at 181. Pettit points to no evidence that he would have been unwilling or unable to provide the additional pound. And although he argues on appeal that Springwater would have gone back to his previous supplier instead of buying the additional pound from him, Pettit offers no evidence that this was a

realistic alternative for Springwater, given that the debt to the supplier preventing his return had apparently not been paid.

"The fact that [Pettit] previously dealt drugs with [Springwater] helps establish the basis of the relationship between them and his intent to do the same." *United States v. Brooks*, 736 F.3d 921, 940 (10th Cir. 2013) (discussing evidence of defendant's prior bad acts), *petition for cert. filed* (U.S. Jan. 27, 2014) (No. 13-8505). Based on the evidence adduced at trial, a reasonable jury could have concluded that Pettit was ready to supply the additional pound and that Springwater could not have obtained a supply of drugs from his previous supplier. This evidence, added to Springwater's testimony concerning his intention to purchase the additional pound of methamphetamine from Pettit, was sufficient to permit a reasonable jury to find beyond a reasonable doubt that Pettit and Springwater had agreed to further violate the law by distributing an additional one pound of methamphetamine. As a result, the drug-quantity element of the offense of conviction was established.

## III.   EVIDENTIARY HARPOON

Next, Pettit alleges prosecutorial misconduct in the form of an "evidentiary harpoon." This is "a metaphorical term used to describe an attempt by a government witness to deliberately offer inadmissible testimony for the purpose of prejudicing the defendant." *United States v. Cavely*, 318 F.3d 987, 996 n.2 (10th Cir. 2003). He asserts that the prosecutor improperly elicited from Matthew Niles, a special agent for the Drug Enforcement Agency, the fact that Pettit was at the probation and parole office when he was administered the *Miranda* warnings. Pettit's counsel

immediately objected.  The district court then took a recess and addressed the objection outside the presence of the jury.  Defense counsel explained that he objected to informing the jury that Pettit was on probation at the time he was interviewed for this case.  Counsel also moved for a mistrial for violating Pettit's right not to have his criminal history revealed to the jury.  The prosecutor stated that Agent Niles's answer was not what he expected.  After reviewing a transcript of the challenged testimony, the court observed that the testimony did not register with the jury and that to give an admonition would compound the problem.  Hence, the court overruled the objection.

We evaluate a claim of prosecutorial misconduct using a two-step process: (1) whether the conduct was improper, and (2) if so, whether it warrants reversal of the conviction.  *Ivy*, 83 F.3d at 1288.  "[A]n allegation of prosecutorial misconduct for which there was a contemporaneous objection presents a mixed question of fact and law that we review *de novo*."  *United States v. Caballero*, 277 F.3d 1235, 1242 (10th Cir. 2002).  Prosecutorial misconduct "is harmless unless there is reason to believe that it influenced the jury's verdict, . . . consider[ing] the trial as a whole."  *Ivy*, 83 F.3d at 1288 (internal quotation marks omitted).

In this case, Agent Niles's statement about where the interview took place did not unambiguously convey the information that Pettit was on probation.  Nevertheless, assuming the comment was improper, we conclude that it was harmless in the context of the trial as a whole.  Any misconduct was "merely singular and isolated," rather than "flagrant enough to influence the jury to convict on grounds

- 10 -

other than the evidence presented." *Id.* (internal quotation marks omitted). For the same reason, we conclude that the district court did not abuse its discretion in denying the request for a mistrial. *See United States v. Tolliver*, 730 F.3d 1216, 1226 (10th Cir. 2013) (reviewing denial of mistrial for abuse of discretion). As discussed above, there was ample evidence to support Pettit's conviction and this single, ambiguous statement did not undermine the jury's verdict.

## IV. SENTENCE

The sentencing range for Pettit's conviction was dependent, among other factors, on the quantity of drugs for which he was held responsible. *See* 21 U.S.C. § 841(b)(1)(A)(viii); USSG § 2D1.1 (2011). The statutory minimum and maximum sentences were 10 years to life in prison. Pettit's sentence under the United States Sentencing Guidelines, based on a drug quantity of at least 500 grams but less than 1.5 kilograms of a substance containing methamphetamine, *see* USSG § 2D1.1(a)(5) and (c)(4); *id.* note (A) (base offense level of 32), considering his criminal history category of II, was 135 to 168 months, *see* R. Vol. 3, at 11, 17. Pettit was sentenced to 135 months.

Pettit argues that the district court erred in sentencing him based on the amount of methamphetamine trafficked by his coconspirators without making particularized findings to support the attribution of his coconspirators' actions to him as relevant conduct. The district court adopted the jury's finding that Pettit had conspired to distribute in excess of 500 grams of a substance containing methamphetamine and sentenced him based on that amount. No relevant conduct by

coconspirators was included to increase the drug amount. And contrary to Pettit's claim, there is no indication that he was held responsible for drug amounts trafficked by the conspiracy before he joined. Therefore, the district court was not required to make particularized findings of the coconspirators' relevant conduct. *Cf. United States v. Figueroa-Labrada*, 720 F.3d 1258, 1264 (10th Cir. 2013) ("A sentencing court must make particularized findings to support the attribution of a coconspirator's actions to the defendant as relevant conduct, whether or not the defendant asks it to do so or disputes the attribution.").

## V. CONCLUSION

Pettit's conviction and sentence are affirmed.

Entered for the Court

Stephen H. Anderson
Circuit Judge