PHILLIPS, J., concurring and dissenting.
I join the majority opinion except for its approval of the protective sweep. I would *1027 conclude that the officers lacked the necessary articulable facts, and associated reasonable inferences, that would support a reasonable belief that a protective sweep would uncover a person endangering those at the arrest scene. And one step further, I would conclude that the sweep exceeded permissible bounds.
I.
On November 28, 2014, police received a telephone call from a confidential informant. The informant reported that earlier that day, while at a hotel in Norman, Oklahoma, Banks had accused him of being an informant. He further reported that Banks had later called him and threatened to gather his "home boys" to come "shoot up" the informant. The informant also reported that he thought he had heard Tyree Cade in the background making threats. The informant gave police the telephone number Banks had used to call him.
The majority opinion thoroughly spells out the events associated with the issuance of a state-court order to ping Banks's telephone and the submission of Officer Stephens's exigent-circumstances form to T-Mobile. Maj. op. at 1011-12. Suffice it to say that about 12:15 a.m. on November 29, police received notice of a ping for the telephone number used by Banks to threaten the informant. The phone had pinged at a house on a dead-end street in a rural part of Spencer, Oklahoma. Because of the distance to Spencer, it took police until about 12:55 a.m. to collect together up near the house. In all, five officers were initially present, one of whom was a deputy sheriff. (Two other deputies arrived later.) Two officers went to the back of the home to intercept anyone trying to flee in that direction. Officer Monte Stephens of the Oklahoma City Police Department sneaked to the front of the house and peered through the front window's thin curtains. Inside, he saw silhouettes of two women sitting on the living-room couch, one counting currency and handling a bundle of cash. Though a car was in the driveway, officers never ran its plates.
Officer Stephens made his way to the front door and knocked. Upon hearing the knock, a female asked who was there. Officer Stephens responded that it was the police. Through the door's frosted glass, Officer Stephens could see people head to a back bedroom. The female responded that she would not open the door until her mother returned. Officer Stephens heard a male voice say "What," the sole indication he had that a male was in the home. R. v. 3 at 87. Next, Officer Stephens heard furniture being moved in front of the door and saw the lights turn off.
About this time, the officers located in back of the home saw the rain gutters shake, leading them to believe that someone might be in the attic. During later testimony, the police acknowledged that they had no reason to suspect criminal activity inside the home and that its occupants were within their rights in not answering the door. There matters stood, for about an hour, until Banks's mother arrived. She had spoken to her son by telephone and urged him to come outside. Soon after her arrival, Banks peacefully surrendered to the police. Banks's two girlfriends soon followed, one carrying an infant. In response to police questions, all three of them declared that no one else was in the house. The police arrested Banks and put him in a patrol car. Police put the two girlfriends in patrol cars, too.
Soon after this, police ran a protective sweep through the house. They justified the protective sweep by asserting safety concerns as well as a desire to arrest Cade on a warrant. On the former basis, police never specifically detailed how Cade would have presented a danger had they simply *1028 driven away with Banks in custody. On the latter basis, Detective McRorie testified that police were at the residence to arrest Banks and Cade and had been trying to serve arrest warrants on both men for the past two weeks. And Officer Stephens testified that the officers had "succeeded in half of their objective in apprehending the two fugitives at that point." R. v. 3 at 72.
Two teams of two officers entered the house. The house is one level, with a living room, kitchen, bathroom, and bedrooms. It also has an attic, accessible from a two-foot-square ceiling panel in a bedroom closet. The police took between ten to fifteen minutes to complete the sweep. During this time, they examined items obviously unconnected to a hiding Cade-for instance, they took time to examine a photograph on a kitchen counter, to go through Banks's wallet, and to identify and grab an Oster mixer bag from a bedroom closet. Officer Stephens described the protective search as one in which "we take each room and we systematically and thoroughly search it" and as a "thorough and slow, cursory search of the house for any type of subjects." R. v. 3 at 93.
At the end of the sweep, Sergeant Harrison Fincham looked into the attic. This required some maneuvering. Because the closet contained nothing to stand upon to reach the two-foot-square panel, police positioned furniture from the living room underneath the attic panel. Even this wasn't enough. Sergeant Fincham still needed officers to hoist him to push the panel aside and lift his head into the attic to see its contents. Had Cade been waiting, especially if as dangerous as the police say, this could have ended tragically. As it was, though, Cade was nowhere in sight, and Sergeant Fincham saw in close proximity the guns and drugs later introduced at trial.
During this time, Banks and his two girlfriends remained in nearby patrol cars. Nothing in the record suggests that they were moved from what the government asserts was a dangerous scene. In fact, after the sweep ended, police brought Banks and his girlfriends back inside the house for interviews. Again from the record, I see nothing showing any concern that Cade might return from an errand or a night on the town.
II.
As the majority notes, the lead case from the Supreme Court is Maryland v. Buie , 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). There the Court laid down some guiding principles. "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." Id . at 327, 110 S.Ct. 1093. The Court rejected the state court's ruling that a protective sweep violates the Fourth Amendment unless the police had "probable cause to believe that a serious and demonstrable potentiality for danger existed." Id . Instead, the Court concluded that the protective sweep would comply with the Fourth Amendment if the police had "a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[ed] the officer in believing ... that the area swept harbored an individual posing a danger to the officers or others." Id . (first alteration in original) (internal quotation marks and citation omitted).
In Buie , police obtained arrest warrants for two men wanted for an armed robbery. Id . at 328, 110 S.Ct. 1093. After verifying that Buie was inside his home, police entered, fanning out over the first two floors.
*1029 Id . One officer stood watch at the top of the basement stairs, shouting for anyone there to show his hands and come upstairs. Id . Buie did so. Id . The issue on appeal concerned what happened next. That same officer descended the stairs to see if anyone remained there. Id . In the basement, he noticed a red running suit on a pile of clothing, an outfit matching one worn by a robber. Id . The Court acknowledged that under Payton v. New York , 445 U.S. 573, 602-03, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), the police had "the right, based on the authority of the arrest warrant, to search anywhere in the house that Buie might have been found, including the basement." Id . at 330, 110 S.Ct. 1093. But the Court further noted that "[o]nce he was found, however, the search for him was over, and there was no longer that particular justification for entering any rooms that had not yet been searched." Id . at 333, 110 S.Ct. 1093.
But another possible justification remained. The Court observed that police might reasonably fear an arrestee's harboring "other persons who are dangerous and who could unexpectedly launch an attack." Id . Here, the Court focused on the arrest's having occurred in the home-declaring associated risks there as at least the equivalent of risks encountered in on-the-street or roadside investigative encounters. Id . Addressing these dangers from in-house arrests, the Court noted that "an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf.' An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings." Id .
Recognizing the safety risks presented during in-house arrests, the Court announced a new Fourth Amendment rule in such circumstances: "incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." Id . at 334, 110 S.Ct. 1093. But beyond that, the Court held, "there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." Id .
Though the majority quotes some of this language to justify a protective sweep from an outside-a-house arrest, the quotes all pertain to "in such circumstances," meaning in-house arrests. Id . As mentioned, in-house arrests present unique dangers because the police are more exposed to ambush-usually they are unfamiliar with the home's layout. In my view, Buie speaks exclusively to in-house arrests. After all, it requires that protective sweeps necessarily have ended at a time "no longer than it takes to complete the arrest and depart the premises." Id . at 336, 110 S.Ct. 1093 (emphasis added). I recite this not to say that Buie prohibits protective sweeps for out-of-house arrests but to emphasize that those arrests offer more limited bases to show the requisite danger than do in-house arrests.
Certainly our circuit has allowed protective sweeps even when the arrest occurs outside the house.[1] But in those cases the government has had stronger evidence than presented here to support its view that the safety of police and others was endangered. See United States v. Cavely , 318 F.3d 987, 994-96 (10th Cir. 2003) (affirming *1030 a protective sweep when the police had arrested the defendant outside the back door of his home while he was carrying Coleman fuel, a product sometimes used to manufacture methamphetamine; when the defendant had $4,000 in cash and some methamphetamine on his person; when police knew the home had been used to manufacture methamphetamine and had contained firearms; and when the defendant told them he had a friend still inside but no one answered when the police knocked on the door); United States v. Tisdale , 921 F.2d 1095, 1096-97 (10th Cir. 1990) (affirming a protective sweep when a parolee fled through a window, followed by the sound of three gunshots, because under these circumstances police reasonably could believe that "other dangerous people might be present or that defendant would return.").
Here, officers had insufficient reason to suspect that Cade was in the house and endangered them or others. Several hours had passed since Banks's threatening call to the informant. The informant hadn't even definitively identified Cade's voice as the one he heard in the background during Banks's threatening call. When Officer Stephens peered in the home's front window, he saw two females sitting on a couch, and he later heard the voice of one male. No officer bothered to run the license plate of the car in the driveway. Any shaking of the rain gutters occurred before Banks and his two girlfriends left the house. No one has explained how Cade would present a threat to the officers' safety if he were in the attic (the record doesn't say that a person could even see outside from the attic).[2] The officers obviously didn't think Cade was a threat to others-they kept Banks and his two girlfriends outside and brought them back inside to interview them after the sweep. No one testified that either Banks or Cade then possessed firearms. And if the police feared for their safety from Cade in the attic, it seems unlikely they would have had Sergeant Fincham remove the ceiling panel and stick his head into the attic, inviting serious injury or death.
In my view, the majority opinion markedly extends the circumstances in which we permit protective sweeps associated with outside-a-house arrests. I don't believe that the government established a reasonable suspicion of safety concern for the officers or for others. And I would not approve the slow, evidence-gathering protective search here. Even if the Buie standard applied full force for outside-a-house arrests, we would need look no further than the police's own testimony to know that the protective sweep was not "quick and limited" and "narrowly confined to a cursory visual inspection of those places in which a person might be hiding."[3] Buie , 494 U.S. at 327, 110 S.Ct. 1093.

Unlike some other circuits, we have required an arrest before authorizing a protective sweep. See United States v. Walker , 474 F.3d 1249, 1254 (10th Cir. 2007).

I am unpersuaded that the police acted to protect their safety and that of others by the protective sweep. I question why the police didn't just drive away after securing Banks in the patrol car. See United States v. Hogan , 38 F.3d 1148, 1150 (10th Cir. 1994) (questioning whether a protective sweep would be needed if police could have put the defendant in the car and driven away).

See also United States v. Parra , 2 F.3d 1058, 1066 n.4 (10th Cir. 1993) (citing Buie , the court declined to rely on the protective-sweep doctrine after noting that "the government cannot plausibly argue that the detectives believed that dangerous accomplices might have been hiding under the bed pillows[.]").