**Opinion on rehearing issued March 27, 2014**



In The

# Court of Appeals

For The

# First District of Texas

————————————————

## NO. 01-12-00712-CR

————————————————

**ISAAC LEWIS SAYERS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 248th District Court**
**Harris County, Texas**
**Trial Court Case No. 1328638**

---

## OPINION ON REHEARING

Appellee, the State of Texas, filed a motion for rehearing of our November

26, 2013 opinion. We withdraw the opinion and judgment dated November 26,

2013, and issue this opinion and judgment in their stead. The disposition remains unchanged.

Appellant, Isaac Lewis Sayers, pleaded guilty to the third-degree felony offense of tampering with physical evidence,[1] and the trial court deferred adjudication of guilt and placed him on community supervision for four years. In one issue, appellant contends that the trial court erred in denying his motion to suppress evidence on the basis that the arresting officers committed an illegal search when they looked through his kitchen window and observed appellant with drugs and drug paraphernalia.

We reverse and remand.

## Background

On November 30, 2011, Deer Park Police Department ("DPPD") Officer D. Bailey was on random patrol when he saw Shari Sucarichi sitting in a truck parked outside of appellant's house around midnight. Officer Bailey knew Sucarichi from high school, and he suspected that she had outstanding warrants. Upon speaking with Sucarichi and then confirming that she had outstanding warrants from the City of Pasadena, he arrested her. During Officer Bailey's encounter with Sucarichi, fellow DPPD Officers F. Becker and J. LaPoint arrived at the scene. Sucarichi told the officers that appellant and another man, Ryan Scalia, were inside

---

[1] *See* TEX. PENAL CODE ANN. § 37.09(a) (Vernon Supp. 2013).

2

the house, and she asked the officers if she could give them the keys to her truck in an effort to avoid impoundment. Officers Bailey and Becker had also known appellant and Scalia since high school, and Officer LaPoint testified at the suppression hearing that he knew Scalia was "a user."

Appellant's house was located on a corner lot, with streets running to the west and north of the house and a driveway on the east side of the house, also running north. The front door was on the west side of the house, and Sucarichi's truck was parked on the street on the north side of the house. The officers arrested Sucarichi beside her truck. A kitchen window, covered by open blinds, was also located on the north side of the house and faced the location where the officers arrested Sucarichi. This window was not located along a pathway to either the front or back door to appellant's house. Through the kitchen window and from their position on the street, the officers could see the silhouettes of two individuals inside the house, but the officers were unable to identify the individuals or determine what they were doing. Sucarichi informed the officers that the electricity to appellant's house had been shut off and that the flickering light that the officers could see through the window was coming from a lantern.

In an effort to accommodate Sucarichi's request to turn her keys over to appellant and Scalia, Officer Becker approached the kitchen window to confirm if appellant and Scalia were the men the officers could see through the window.

Officer Becker, who is "shorter in stature," tried to look through the kitchen window, but he could not see inside the house, so he called the other officers over. After Officer Bailey placed Sucarichi in the back of his patrol car, he and Officer LaPoint both walked over to the window.[2] None of the officers attempted to knock on either the front or back door of the house before looking in the window. The officers stepped into a flowerbed to see into the kitchen window. Officer LaPoint "could clearly see in the window," and he observed that "Scalia was messing around with some heroin and loading up some needles and [appellant] was standing right to his left."

Officer LaPoint remained standing at the window while Officers Bailey and Becker walked around to the rear of the house. Officer LaPoint saw Scalia move away from the window and heard the other officers yelling. Appellant remained at the kitchen sink near the window, and Officer LaPoint watched him push the drugs and needles into the sink. The officers then arrested both Scalia and appellant.

Appellant moved to suppress the drugs and drug paraphernalia on the grounds that the officers did not have a search warrant, and they had neither

---

[2]    The record is unclear concerning how close the driveway is to the kitchen window and how close the window is to the street where the officers arrested Sucarichi. The pictures of appellant's house, entered into evidence at the suppression hearing, reflect a large flowerbed along the northern side of the house. Part of this flowerbed is underneath the kitchen window. Unlike the cement walkway leading up to the front door on the western side of the house, which is clearly visible in the State's exhibits, there does not appear to be a similar walkway running near the kitchen window on the northern side of the house.

probable cause nor reasonable suspicion to enter onto his curtilage and perform a search by looking into his kitchen window.

At the suppression hearing, the trial court stated that the officers did not have probable cause to believe that appellant was committing a crime before approaching the kitchen window. The court then stated,

> I don't know how the law can be devised for a police officer to be courteous. And I listen to this, you know, so often people go, ["]my family was right there, if I could have just given my keys.["] And they see the guys, I don't know what that distance is, 15 feet, see him right there and they're walking over.

> I'm going to deny the Motion to Suppress, the appellate court may disagree with me on this one. There is not a courteous officer exception or just a plain old person exception so they may just reverse me on this one. I'm kind of 50/50 on what they might do.

> I believe the testimony of this officer. I watched his demeanor, calm, cool, collected. It doesn't appear like they were trying to peer in windows to see if other people were committing crimes. Just the opposite. ["]Is that them? Let's get them over there and hand them the keys.["] That may not fit any exception—it did not fit any of the exceptions in these cases. It seems like a reasonable act for an officer to do the same thing so I'm denying it on that.

The trial court further stated, "[Officer LaPoint] said the blinds were open, they could see in there, that they looked. . . . I can't say that's an illegal act by the officers."

After the trial court denied his motion to suppress, appellant pleaded guilty to the third-degree felony offense of tampering with physical evidence. Based upon an agreed recommendation on punishment, the trial court deferred

5

adjudication of guilt and placed appellant on four years' community supervision. The trial court certified appellant's right to appeal, and this appeal followed.

## Motion to Suppress

In his sole issue, appellant contends that the trial court erred in denying his motion to suppress evidence because the officers engaged in an illegal search when they intruded onto appellant's curtilage and looked in his kitchen window.

### A.     *Standard of Review*

We review a denial of a motion to suppress evidence for an abuse of discretion. *Shepherd v. State*, 273 S.W.3d 681, 684 (Tex. Crim. App. 2008) (citing *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006)). When we review a trial court's denial of a motion to suppress, we give "almost total deference to a trial court's express or implied determinations of historical facts [while] review[ing] de novo the court's application of the law of search and seizure to those facts." *Id.* We view the evidence in the light most favorable to the trial court's ruling. *Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007) (quoting *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006)). The trial court is the "sole trier of fact and judge of credibility of the witnesses and the weight to be given to their testimony." *St. George v. State*, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007). The trial court may choose to believe or disbelieve any part or all of a witness's testimony. *Green v. State*, 934 S.W.2d 92, 98 (Tex. Crim. App. 1996).

6

We sustain the trial court's ruling only if it is reasonably supported by the record and correct on any theory of law applicable to the case. *Laney v. State*, 117 S.W.3d 854, 857 (Tex. Crim. App. 2003).

### B. Entry onto Curtilage and Search of Appellant's House

### 1. Flowerbed adjacent to house is part of curtilage

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV. When the government obtains information by "physically intruding" on an individual's house, "a 'search' within the original meaning of the Fourth Amendment" has "undoubtedly occurred." *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013) (quoting *United States v. Jones*, 132 S. Ct. 945, 950–51 n.3 (2012)). The Supreme Court has held that although the Fourth Amendment does not "prevent all investigations conducted on private property," the home "is first among equals." *Id.* One of the core principles of the Fourth Amendment is a person's right "to retreat into his own home and there be free from unreasonable governmental intrusion." *Id.* (quoting *Silverman v. United States*, 365 U.S. 505, 511, 81 S. Ct. 679, 683 (1961)). As the Supreme Court stated in *Jardines*,

> This right would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity; the right to retreat would be significantly diminished if the

7

police could enter a man's property to observe his repose from just outside the front window.

*Id.*

To that end, the Fourth Amendment also protects the curtilage, the area "immediately surrounding and associated with the home," which is classified as "part of the home itself for Fourth Amendment purposes." *Id.* (quoting *Oliver v. United States*, 466 U.S. 170, 180, 104 S. Ct. 1735, 1742 (1984)). The curtilage is the area around the home, including porches and other areas adjacent to the home, that is "intimately linked to the home, both physically and psychologically" and "to which the activity of the home life extends." *Jardines*, 133 S. Ct. at 1415 (quoting *California v. Ciraolo*, 476 U.S. 207, 213, 106 S. Ct. 1809, 1812 (1986) and *Oliver*, 466 U.S. at 182 n.12, 104 S. Ct. at 1743 n.12).

Defining the boundaries of curtilage is a "familiar" concept "easily understood from our daily experience." *Oliver*, 466 U.S. at 182 n.12, 104 S. Ct. at 1743 n.12. In determining whether a particular area is so intimately tied to the home as to constitute curtilage, we consider factors including (1) the proximity of the area to the home; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) the steps taken by the resident to protect the area from observation by people passing by. *See United States v. Dunn*, 480 U.S. 294, 301, 107 S. Ct. 1134, 1139 (1987). Whether a particular area is included within the curtilage is determined by

8

whether the defendant had a reasonable expectation of privacy in the area. *Porteous v. State*, 259 S.W.3d 741, 746 (Tex. App.—Houston [1st Dist.] 2007), *pet. dism'd, improvidently granted*, 253 S.W.3d 288 (Tex. Crim. App. 2008).

Here, the officers observed appellant's activities inside his house while standing in the flowerbed located directly underneath his kitchen window. This flowerbed, although visible to the public from the street bordering the north side of the house, was not located on the same side of appellant's house as either the front or back door to the home and was not located next to a sidewalk or other walkway. There is no indication that this flowerbed was used for any purpose other than to hold plants and flowers, and there is no indication that the public was invited to stand in or walk through this flowerbed. We conclude that the flowerbed is clearly part of the area "immediately surrounding and associated with the home" and falls within the curtilage of appellant's home, thus entitling it to the same Fourth Amendment protection afforded to appellant's home itself. *See Jardines*, 133 S. Ct. at 1414 (stating that person's Fourth Amendment right to be free from government intrusion in own home "would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity"). The flowerbed under appellant's kitchen window is therefore a constitutionally protected area.

## 2. *Intrusion onto curtilage not justified*

Law enforcement officers are not required to "'shield their eyes' when passing by the home 'on public thoroughfares,'" but their ability "to gather information is sharply circumscribed" when they leave the public thoroughfares and enter constitutionally protected areas. *Id.* at 1415 (quoting *Ciraolo*, 476 U.S. at 213, 106 S. Ct. at 1812). When officers gather information in constitutionally protected areas, we must determine whether this was "accomplished through an unlicensed physical intrusion" onto the property. *Id.* Law enforcement officers, like members of the public, have an implied license to approach a home via the front walkway and knock on the front door. *Id.* ("This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave."); *Washington v. State*, 152 S.W.3d 209, 214 (Tex. App.—Amarillo 2004, no pet.) (holding that general restrictions upon intruding upon curtilage do "not prevent a police officer from approaching and knocking upon the front door of a home"). Police officers who do not have a warrant to search the property "may approach a home and knock, precisely because that is 'no more than any private citizen might do.'" *Jardines*, 133 S. Ct. at 1416 (quoting *Kentucky v. King*, 131 S. Ct. 1849, 1862 (2011)).

This implied license granting permission to police officers to enter onto the curtilage to contact the resident exists so long as the resident has not manifested an intent to restrict access to his home, such as by locking a gate or posting signs indicating that the officer is not invited, and the officer "does not deviate from the normal path of traffic" to the front or back door of the house. *See Washington*, 152 S.W.3d at 215 (citing *Buchanan v. State*, 129 S.W.3d 767, 773 (Tex. App.—Amarillo 2004, pet. ref'd)); *see also Duhig v. State*, 171 S.W.3d 631, 637–38 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd) (citing with approval cases from other intermediate appellate courts holding that approaching back door of home is permissible and does not constitute search when officers have first tried front door and received no answer). A license to enter onto property is limited to a particular area of the property. *See Jardines*, 133 S. Ct. at 1416. Thus, an implied license to approach the front door via the front walkway to contact the resident does not extend permission to walk up to a window located on a separate side of the house to attempt to contact the resident. *See id.* ("The scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose.").

In this case, a small yard separated the northern side of the house from the street where the officers arrested Sucarichi. Although the officers could see a flickering light and the silhouettes of two men through the kitchen window from their position in the street, they were unable to positively identify the men or

11

determine what they were doing. The officers made no attempt to contact appellant and Scalia by using the front or back doors to appellant's residence. Instead, after deciding to accommodate Sucarichi's request to leave her keys with either appellant or Scalia, Officer Becker approached the kitchen window, which was located on a different side of the house from either the front or back doors, which were located on the western and eastern sides of the house, respectively. No pathways led to this window, no pathways ran next to this window, and the officers had to stand in a flowerbed located directly under the window in order to see inside. One of the officers was not tall enough to see inside the window.

Unlike a window located next to a front door, for example, this window was not located near any established pathway to approach appellant's house. *Cf. King*, 131 S. Ct. at 1858 ("[W]e have held that law enforcement officers may seize evidence in plain view, provided that they have not violated the Fourth Amendment in arriving at the spot from which the observation of the evidence is made."); *Duhig*, 171 S.W.3d at 636 ("*While rightfully at the front door*, the deputies were free to observe evidence in 'plain view.'") (emphasis added); *Washington*, 152 S.W.3d at 214 ("Because entry is impliedly authorized, there exists no reasonable expectation [of privacy] with regard to things observed by those on the pathway to the house."). Custom may have granted the officers an implied license to approach appellant's front or back door to contact him and hand

12

over Sucarichi's keys, but it did not grant them license to approach a completely unrelated area of the house. *See Jardines*, 133 S. Ct. at 1416. Indeed, as the Supreme Court noted in *Jardines*,

> To find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to— well, call the police.

*Id.* Here, the officers discovered evidence of appellant's wrongdoing solely by physically entering onto an area of appellant's property where they had no right or license to be and then looking through his kitchen window.[3] This activity by the officers constitutes a search. *See id.* at 1417 ("That the officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred.").

While acknowledging that "no case is factually similar," the State relies on our opinion in *Atkins v. State*, 882 S.W.2d 910 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd), for the proposition that the officers' actions here did not constitute a search. In *Atkins*, the investigating officers received a tip that narcotics

---

[3] The State classifies this action as a "minimally intrusive glance into the window." The officers here did not happen to glance into an open window on their way to an established entry point into the house, such as the front or back door. Instead, they walked directly to this window without attempting to contact appellant via the front or back door, stood in appellant's flowerbed, and looked into the window. This activity is not "minimally intrusive" but instead violates the "sanctity of a man's home and the privacies of life." *Oliver v. United States*, 466 U.S. 170, 180, 104 S. Ct. 1735, 1742 (1984).

were being sold from a particular address. *Id.* at 912. Two officers simultaneously approached the house to talk to the occupants; one approached the front door while the other approached the back door. *Id.* As the officer approached the back door, Atkins went out the back door into the backyard and, startled by the officer's presence, dropped two plastic baggies containing heroin. *Id.* In affirming the trial court's denial of Atkins's motion to suppress, we noted that the officer intruded on the curtilage, that the "evidence indicate[d] the way to the rear of the house was not an area to which the general public was invited," and that "[t]here is no testimony that the back door was in plain view." *Id.* at 913. However, in agreeing with the State that the officer's activity did not constitute a search, we relied on two previous Court of Criminal Appeals cases holding that officers' attempts to contact the occupants of a house via either the front door or the back door to the residence do not constitute a search. *See id.* ("[T]here is no evidence in the case to indicate anything other than the reasonable inference that the officer was making a joint initial attempt with the other officer to contact the inhabitants of the house, as sanctioned in *Long* and *Gonzalez*.") (citing *Long v. State*, 532 S.W.2d 591, 594–95 (Tex. Crim. App. 1975) and *Gonzalez v. State*, 588 S.W.2d 355, 360 (Tex. Crim. App. 1979)).

*Atkins* is factually distinguishable. The officer in *Atkins* was on his way to the back door to contact the occupants, as was permissible under prior holdings

14

from the Court of Criminal Appeals, when he observed Atkins in possession of heroin. *See id.* Here, the officers ignored appellant's front and back doors and instead approached a window not located near either of these established entry points into appellant's house and not located along established pathways to these entry points. Only by standing in the flowerbed and looking into the window could the officers see any evidence of wrongdoing.[4] Moreover, more recent case law cites *Atkins* for the proposition that officers may permissibly enter the curtilage of a residence to contact the occupant when the occupant has not manifested his intent to prohibit or restrict access or the officer does not "deviate from the normal path of traffic." *See Washington*, 152 S.W.3d at 214–15; *Buchanan*, 129 S.W.3d at 772–73. Here, the officers ignored the normal path of traffic to appellant's front and back doors and instead chose to approach a completely distinct window located on another side of the house.

---

[4]    The State repeatedly argues that the blinds on the kitchen window were open and that the window "allowed unrestricted views from the street nearby." It is undisputed that the officers could see into the house through this window from the street. However, Officer LaPoint also testified that, from the street, the officers could only see a flickering light and the silhouettes of two men standing near the window. They were not able to positively identify the men from the street, nor were they able to see what the men were doing at the window, which is precisely why the officers decided to walk up to the window. We also note that the bottom ledge of this window was high enough that one of the officers was not tall enough to see into the window and had to call the other officers over to take a look. Thus, characterizing this window as "allow[ing] unrestricted views from the street nearby" is misleading.

The officers made the observations leading to appellant's arrest from the curtilage, a constitutionally protected area, and they had neither an express nor an implied license to be in the specific area of the curtilage from which they made their observations. It is undisputed that the officers did not have a warrant to search appellant's house and that the officers did not have probable cause to believe that any criminal activity was occurring in the house.

The State makes two further points in arguing that the trial court's ruling should be affirmed: (1) in evaluating the officers' actions, we should consider officer safety; and (2) we should create a "courteous officer" exception to the warrant requirement or extend the community-caretaking exception to include situations in which officers, in performing courteous acts for recent arrestees, view unrelated criminal activity. We are not persuaded by either argument. While we agree that officer safety is certainly an important consideration, we cannot agree with the State that approaching one of the doors of appellant's residence, announcing the officers' presence and their purpose for approaching the house, and waiting for appellant to answer the door, even at midnight and knowing that the electricity at appellant's house had been shut off, is somehow more dangerous than approaching, and potentially surprising, two people at a random window of the house. Moreover, if the officers had truly believed that they faced a dangerous situation in making contact with appellant and Scalia, they

16

could have, and should have, denied Sucarichi's request, which would have been well within their discretion.

Other than citing *Cady v. Dombrowski*, 413 U.S. 433, 93 S. Ct. 2523 (1973), which established the community-caretaking exception, the State provides no authority for why that doctrine, which recognizes that "[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency," should be expanded to cover the situation present here, in which officers, in an attempt to aid and reduce inconvenience to an arrestee, invade the property and privacy rights of an unrelated individual. *See Mincey v. Arizona*, 437 U.S. 385, 392, 98 S. Ct. 2408, 2413 (1978) (stating purpose of community-caretaking exception); *see also Wright v. State*, 7 S.W.3d 148, 152 (Tex. Crim. App. 1999) (noting that community-caretaking exception has "narrow applicability" and stating, "Only in the most unusual circumstances will warrantless searches of private, fixed property, or stops of persons located thereon, be justified under the community caretaking function, given the greater expectation of privacy inherent with respect to residences and other private real property").

We conclude that the officers in this case engaged in an unconstitutional search when they looked through appellant's kitchen window, a window not

17

located near any established pathway to a door to appellant's house. We hold that the trial court erred when it denied appellant's motion to suppress.

We sustain appellant's sole issue.

### C.    *Protective Sweep*

In its motion for rehearing, the State asserts a new basis for finding that the warrantless search of appellant's house was justified: the officers were conducting a protective sweep when they stepped into appellant's flowerbed and looked into his kitchen window.[5] Appellant argues that the factual circumstances presented in this case do not justify a protective sweep. We agree with appellant.

A "protective sweep" is a "quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Maryland v. Buie*, 494 U.S. 325, 327, 110 S. Ct. 1093, 1094 (1990); *Reasor v. State*, 12 S.W.3d 813, 815 (Tex. Crim. App. 2000). This search must be "narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Buie*, 494 U.S. at 327, 110 S. Ct. at 1094. For a protective sweep to be

---

[5]    It is within the discretion of the appellate court to consider new grounds raised for the first time in a motion for rehearing. *See Rochelle v. State*, 791 S.W.2d 121, 124 (Tex. Crim. App. 1990) ("If a party raises a new ground for the first time on motion for rehearing, we believe the clear import of the rules [of appellate procedure] is that the decision of whether to consider that new matter is left to the sound discretion of the appellate court."); *see also Hughes v. State*, 878 S.W.2d 142, 151 (Tex. Crim. App. 1993) (op. on reh'g) ("We have previously held there are times when, 'as justice requires' or 'in the interest of justice,' an appellate court may consider a supplemental brief or a motion for rehearing to decide an issue not presented in the original briefs.").

18

justified, the searching officer must possess "a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 337, 110 S. Ct. at 1099–1100. As the State points out, courts have extended *Buie*, which involved a protective sweep incident to an in-home arrest, to protective sweeps of residences following an arrest made outside of the residence. *See, e.g.*, *United States v. Lawlor*, 406 F.3d 37, 41–43 (1st Cir. 2005); *United States v. Cavely*, 318 F.3d 987, 995–96 (10th Cir. 2003).

The Court of Criminal Appeals adopted the protective-sweep exception to the warrant requirement in *Reasor*. 12 S.W.3d at 816–17. The court held, "When conducting an in-home arrest, a police officer may sweep the house only if he possesses an objectively reasonable belief, based on specific and articulable facts, that a person in that area poses a danger to that police officer or to other people in the area." *Id.* at 817. The protective sweep must stay "within the appropriate scope" and "may last long enough to 'dispel the reasonable suspicion of danger.'" *Id.* "[E]very protective sweep must be justified under the circumstances particular to that case." *Cooksey v. State*, 350 S.W.3d 177, 187 (Tex. App.—San Antonio 2011, no pet.).

Here, the evidence does not support a conclusion that the arresting officers possessed "an objectively reasonable belief, based on specific and articulable facts" that a person in appellant's house posed a danger to the officers or Sucarichi.

19

*See Reasor*, 12 S.W.3d at 817. The State argues, based on Officer LaPoint's testimony at the suppression hearing, that the officers arrested Sucarichi "right there in front of [appellant's kitchen] window," which presented a potentially dangerous situation for the officers. Officer LaPoint's testimony, however, reflects that the officers arrested Sucarichi at her truck, which was parked along the street bordering appellant's property. The exhibits entered into evidence at the suppression hearing reflect that a flowerbed, a small yard, and a sidewalk separated appellant's kitchen window from the street where Sucarichi was arrested. Therefore, her arrest did not occur "right there" at appellant's kitchen window.

Furthermore, this case is factually distinguishable from the cases cited by the State in support of its argument that a protective sweep was justified. Officer LaPoint acknowledged that the officers did not have probable cause to believe that appellant and Scalia were engaging in criminal activity inside the house, and they were not initially called out to appellant's residence to investigate suspected criminal activity or to execute a search or arrest warrant. There is also no evidence that the officers knew that appellant or Scalia had a history of violent behavior, that the officers suspected that appellant or Scalia possessed firearms, that the officers had received reports of violence occurring at appellant's house in the past or on the night of Sucarichi's arrest, that appellant and Scalia were even aware of the officers' presence outside the house and of Sucarichi's arrest, or that anyone other

20

than appellant and Scalia, who were visible through the kitchen window, was present inside. *Contra Lawlor*, 406 F.3d at 38–39 (officers had received report of altercation and gunshot at defendant's residence, were familiar with defendant and knew he had been involved in drug activities, and had witnessed defendant appear ready to attack another man, and officers observed one woman standing inside open doorway, spent shells located around doorway, and all individuals present were standing right outside front door); *Cavely*, 318 F.3d at 994–95 (officers went to defendant's house to execute arrest warrant for defendant, officers knew from prior searches of house that firearms had been found, officers saw defendant walk to detached garage carrying chemicals, defendant stated when detained that his friend was inside house, but his friend did not answer when officers yelled inside and announced their presence); *United States v. Wilson*, 306 F.3d 231, 233–34 (5th Cir. 2002) (officers received complaint of aggravated assault with firearm against third party and unknown man, officers met and arrested third party outside apartment, and third party told officers someone else was inside apartment), *overruled on other grounds*, *United States v. Gould*, 364 F.3d 578 (5th Cir. 2004).

To justify a belief that the officers faced a potentially dangerous situation, the State can point only to the facts that Sucarichi's arrest occurred around midnight, that the electricity had been turned off at appellant's house, and that a flickering lantern illuminated two men standing at the kitchen window, one of

21

whom, Scalia, was known to the officers as a "user." Although Officer LaPoint testified that when approaching a house officers generally "have to be careful" because "[y]ou never know what could happen," he did not testify that he, or any of the other arresting officers, believed that appellant or Scalia posed a threat to their safety, nor did he testify to any specific, articulable facts that would have supported such a belief. When the State asked Officer LaPoint at the suppression hearing what the officers' purpose was in approaching appellant's kitchen window, Officer LaPoint did not state that the officers were trying to secure the scene or ensure that no one inside posed a danger to the officers or Sucarichi. Instead, he stated, "I guess initially [Officer] Becker went over there to see if that was, in fact, Scalia and Sayers standing at the window," as Sucarichi had said when she asked the officers if she could hand over her truck keys to one of the occupants of the house. Thus, there is no evidence that the officers initially approached appellant's house for officer or public-safety reasons. *See Reasor*, 12 S.W.3d at 817 ("Nor did [the arresting officer] once articulate his belief that a third person inside the home was attempting to jeopardize either his or the public's safety."); *Davis v. State*, 74 S.W.3d 90, 97 (Tex. App.—Waco 2002, no pet.) (refusing to find that "protective sweep" was justified, in part because one of arresting officers testified that he entered kitchen where contraband was found "to put the ice cream [which had been

22

melting in the living room] into the freezer, not because he was fearful someone was there").

As we have already stated, to effectuate Sucarichi's arrest, which occurred on the street, the officers were not required to approach appellant's house. If the officers had truly believed that approaching appellant's house—which had the electricity turned off and was illuminated solely by a flickering lantern—was dangerous and that appellant and Scalia posed a threat to their safety, they could have denied Sucarichi's request to hand over her truck keys and instead followed the usual impoundment procedures. Here, there was no necessity for the officers to approach appellant's house after arresting Sucarichi.

Based on the factual circumstances presented in this case, we conclude that the arresting officers, at the time they initially approached appellant's house, did not possess an objectively reasonable belief, based on specific and articulable facts, that appellant's house harbored individuals who posed a danger to those on the arrest scene. *See Reasor*, 12 S.W.3d at 817; *Cooksey*, 350 S.W.3d at 187 (holding that officers did not have reasonable, articulable suspicion that defendant posed danger to their safety); *Davis*, 74 S.W.3d at 96–97 (holding that officers did not have reasonable, articulable suspicion that someone other than two women who were being watched by officer was inside trailer and might harm officers). We

therefore hold that the search in this case cannot be justified under the protective-sweep exception to the warrant requirement.

We overrule the State's issue raised on rehearing.

## Conclusion

We reverse the judgment of the trial court and remand the case for further proceedings consistent with this opinion.

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Higley, and Massengale.

Publish.  TEX. R. APP. P. 47.2(b).