# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-18-00298-CV

**Appellants Susan Lewis King and Austin King, M.D. //
Cross-Appellant Ken Paxton, Attorney General of Texas**

**v.**

**Appellees, Ken Paxton, Attorney General of Texas; and The City of Abilene, Texas //
Cross-Appellees, Susan Lewis King and Austin King, M.D.**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT
NO. D-1-GN-16-001160, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING**

## O P I N I O N

Appellants Susan Lewis King and Austin King, M.D., appeal from portions of the district court's summary judgment ordering the disclosure of certain information under the Public Information Act (PIA). Cross-appellant Ken Paxton, the Attorney General of Texas, appeals from other portions of the summary judgment ordering that certain information be withheld from disclosure. We will affirm in part and reverse and render in part the judgment of the district court.

## BACKGROUND

Susan Lewis King (hereinafter referred to as Mrs. King) is a former member of the Texas House of Representatives for District 71 based in Abilene. Austin King, M.D., (hereinafter referred to as Dr. King) is her husband. On the night of October 11, 2015, Abilene Police Department (APD) officers arrived at the Kings' residence to conduct a "welfare check" on Mrs.

King, who was home alone at the time. Mrs. King did not immediately answer the door when the officers knocked and instead called 911 to report what she believed to be a burglary. After dispatch convinced Mrs. King that the people knocking on her door were police officers, she opened the door, stepped outside onto her front porch, and proceeded to speak with the officers and other individuals regarding various matters.

Mrs. King's conversations occurred primarily on her front porch but also inside her home. Two of the officers' patrol-car dash cameras that captured video from within the cars and audio from microphones that were worn on each officer's body recorded the event.[1] Toward the end of the incident, Mrs. King agreed to accompany the officers to a location where her mental health could be evaluated. The police vehicle that transported Mrs. King to that location was equipped with a camera that recorded video from inside the vehicle, while the body microphones of the two officers involved in the transport recorded the audio inside the vehicle.[2]

Reporters for a local television station, KTXS, later filed open-records requests seeking to obtain police records related to the incident. The requested records included the audio and video recordings summarized above,[3] incident reports and notes prepared by APD officers, and

---

[1] These recordings were identified in the court below as "J_____MVR" and "S_____MVR." The "J" and "S" designations are redacted references to the officers' names. MVR is an acronym for "motor vehicle recording."

[2] This recording was identified in the court below as "W_____MVR."

[3] (1) The audio recording of the call initiating the welfare check on Mrs. King; (2) the audio recording of Mrs. King's 911 call; (3) the "J_____MVR"; (4) the "S_____MVR"; and (5) the "W_____MVR."

emails exchanged among APD officers, the Abilene City Attorney, and the Department of Public Safety (DPS).

The City of Abilene sought rulings from the Attorney General as to whether the records responsive to the requests should be released. In its requests for information, the City raised two exceptions to disclosure under the Texas Government Code: (1) Section 552.108(a)(2), which excepts from disclosure information held by a law enforcement agency or prosecutor that deals with the detection, investigation, or prosecution of crime, if the information is in relation to an investigation that did not result in conviction or deferred adjudication; and (2) Section 552.101, which excepts from disclosure "information considered to be confidential by law, either constitutional, statutory, or by judicial decision," and encompasses the doctrine of common-law privacy. The Attorney General issued letter rulings concluding that some but not all of the information was excepted from disclosure, and the Attorney General ordered the City to release the information that it had concluded was not excepted from disclosure. *See* Tex. Att'y Gen. OR2016-05287, OR2016-05982.

The Kings then filed suit against both the Attorney General and the City of Abilene, seeking declaratory and injunctive relief that the information at issue was excepted from disclosure in its entirety. The parties filed cross-motions for summary judgment. The Kings, in their motion, raised additional exceptions to disclosure. These exceptions, which we discuss in detail below, included Section 552.108(b)(2) of the Texas Government Code, Section 1701.661(f) of the Texas Occupations Code, Section 611.002 of the Texas Health and Safety Code, and Section 552.109 of

3

the Texas Government Code. The Kings also argued that disclosure of the information would violate their constitutional and common-law rights to privacy.

The district court granted in part and denied in part the cross-motions for summary judgment filed by the Kings and the Attorney General.[4] In a decision letter that preceded its ruling, the court explained that it agreed that the material withheld by the Attorney General was excepted from disclosure but concluded that additional information should also be withheld, mostly under the doctrine of common-law privacy. However, the court also ruled that additional information was excepted from disclosure: one of the emails between an APD officer and DPS, citing to Section 411.192 of the Texas Government Code;[5] three portions of the audio recordings of Mrs. King's conversations that occurred while Mrs. King was inside her home, citing to Section 1701.661(f) of the Texas Occupations Code;[6] and three portions of the audio recordings of Mrs. King's conversations with a mental-health professional, citing to Section 611.002 of the Texas Health and Safety Code.[7]

---

[4] The district court also ruled that the cross-motion for summary judgment filed by the City of Abilene, which concerned governmental immunity and attorney's fees, was mooted by virtue of a Rule 11 agreement between the parties. That ruling is not before us in this appeal.

[5] This exception, which is not at issue in this appeal, relates to certain DPS records that are considered confidential by law. *See* Tex. Gov't Code § 411.192.

[6] Two of the portions that the district court withheld were from the "J_____MVR." The third portion that the district court withheld was from the "S_____MVR."

[7] Two of the portions that the district court withheld were on the "S_____MVR," while the third was on the "J_____MVR."

4

Both the Kings and the Attorney General have appealed from the district court's judgment.[8] The Kings argue on appeal that all of the information at issue should be withheld, while the Attorney General argues on cross-appeal that the Occupations Code exception does not apply to any of the recordings made during the welfare check. The Attorney General does not challenge the district court's decision to order the withholding of any other information.

## STANDARD OF REVIEW

This case requires us to construe statutory exceptions to disclosure under the PIA. The statutory-construction issues arise in the context of cross-motions for summary judgment that the district court granted in part and denied in part. In our review of such cases, "we determine all issues presented and render the judgment the trial court should have rendered." *Colorado Cty. v. Staff*, 510 S.W.3d 435, 444 (Tex. 2017) (citing *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013)).

"Statutory construction presents a question of law that we determine de novo under well-established principles." *Paxton v. City of Dallas*, 509 S.W.3d 247, 256 (Tex. 2017) (citing *TIC Energy & Chem., Inc. v. Martin*, 498 S.W.3d 68, 74 (Tex. 2016)). "When construing a statute, our primary objective is to give effect to the Legislature's intent." *Staff*, 510 S.W.3d at 444. "We seek that intent 'first and foremost' in the statutory text, and '[w]here text is clear, text is determinative' of intent." *Id.* (quoting *Greater Hous. P'ship v. Paxton*, 468 S.W.3d 51, 58 (Tex. 2015); *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009)). "The plain meaning of the text is

---

[8] The City of Abilene did not appeal from the district court's judgment but is an appellee in the case.

5

the best expression of legislative intent unless a different meaning is apparent from the context or the plain meaning leads to absurd or nonsensical results." *Molinet v. Kimbrell*, 356 S.W.3d 407, 411 (Tex. 2011). "When interpreting the Legislature's words, however, we must never 'rewrite the statute under the guise of interpreting it,' and we may not look beyond its language for assistance in determining legislative intent unless the statutory text is susceptible to more than one reasonable interpretation." *Staff*, 510 S.W.3d at 444 (quoting *In re Ford Motor Co.*, 442 S.W.3d 265, 284 (Tex. 2014), and citing *Texas Mut. Ins. Co. v. Ruttiger*, 381 S.W.3d 430, 452 (Tex. 2012)). Stated another way, "[w]e must enforce the statute 'as written' and 'refrain from rewriting text that lawmakers chose.'" *Jaster v. Comet II Constr., Inc.*, 438 S.W.3d 556, 562 (Tex. 2014) (quoting *Entergy Gulf States, Inc.*, 282 S.W.3d at 443). "If a statute uses a term with a particular meaning or assigns a particular meaning to a term, we are bound by the statutory usage." *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011) (citing *Texas Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002)). "We presume that the Legislature chooses a statute's language with care, including each word chosen for a purpose, while purposefully omitting words not chosen." *Id*. (citing *In re M.N.*, 262 S.W.3d 799, 802 (Tex. 2008)). Moreover, "[l]anguage cannot be interpreted apart from context" and the words chosen by the Legislature "must be read in the context of the whole statute." *Id*. at 441. Finally, although "absurd" results are to be avoided, we must be mindful that the "absurdity safety valve is reserved for truly exceptional cases, and mere oddity does not equal absurdity." *Combs v. Health Care Servs. Corp.*, 401 S.W.3d 623, 630 (Tex. 2013).

6

## ANALYSIS

**General principles in construing the PIA**

"The PIA embodies the State's policy that 'each person is entitled, unless otherwise expressly provided by law, at all times to complete information about the affairs of government and the official acts of public officials and employees.'" *City of Dallas*, 509 S.W.3d at 251 (quoting Tex. Gov't Code § 552.001(a)). "Under the PIA, the public has a right of access to 'public information,' a broadly defined term." *Id*. (citing Tex. Gov't Code §§ 552.002(a), .021). Thus, the Legislature has provided that the PIA "shall be liberally construed in favor of granting a request for information." Tex. Gov't Code § 552.001(b).

"The right to access is not absolute, however; the Legislature incorporated into the PIA more than sixty exceptions to the public-disclosure requirement," ranging from "very broad to more specific categories of information." *City of Dallas*, 509 S.W.3d at 251. "Those exceptions embrace the understanding that the public's right to know is tempered by the individual and other interests at stake in disclosing that information." *Texas Dep't of Pub. Safety v. Cox Tex. Newspapers, L.P.*, 343 S.W.3d 112, 114 (Tex. 2011). However, "the Legislature has clearly expressed its intent that exceptions to disclosure be construed narrowly." *Jackson v. State Office of Admin. Hearings*, 351 S.W.3d 290, 299 (Tex. 2011). With these principles in mind, we turn to the exceptions to disclosure that are at issue in this case.

**Section 552.108(b)(2) of the Texas Government Code**

The Kings first argue that all of the information at issue is excepted from disclosure under Section 552.108(b)(2) of the Texas Government Code. This exception provides that "[a]n internal record or notation of a law enforcement agency or prosecutor that is maintained for internal use in matters relating to law enforcement or prosecution is excepted from the requirements of [disclosure] if the internal record or notation relates to law enforcement only in relation to an investigation that did not result in conviction or deferred adjudication." Tex. Gov't Code § 552.108(b)(2). According to the Kings, the welfare check on Mrs. King was an "investigation that did not result in conviction or deferred adjudication," and all of the information at issue consists of APD's internal records relating to that "investigation." Therefore, in the Kings' view, none of the records from the welfare check should be disclosed.

The threshold question for the Kings is whether they can raise this exception. "Typically, a request for public information involves two parties, the governmental body holding the information and the citizen requesting it, and the governmental body must promptly ask the Attorney General for a ruling, if it believes an exception applies." *Boeing Co. v. Paxton*, 466 S.W.3d 831, 833 (Tex. 2015). Thus, as a general rule, "the Public Information Act requires a governmental body to raise and argue any applicable disclosure exception to the Attorney General as a prerequisite to judicial review." *Id*. at 837 (citing Tex. Gov't Code §§ 552.301–.303, .324–.326). Here, the City did not raise Section 552.108(b)(2) as an exception to disclosure.

However, in *Boeing*, the Texas Supreme Court held that the governmental body need not raise the exception "when the requested information implicates another person's privacy or

8

property interests." *Id*. (citing Tex. Gov't Code § 552.305). In such circumstances, the third party whose privacy or property interests are implicated may also raise the exception, and the governmental body's failure to raise the exception does not waive the issue for the third party. *Id*. at 837–38. The Kings assert that Section 552.108(b)(2) implicates their privacy interests and that, per the holding in *Boeing*, they are entitled to raise the exception themselves. The Attorney General argues that Section 552.108 does not implicate a third party's privacy interests and, consequently, *Boeing* does not apply here.

We need not decide in this case whether *Boeing* applies to Section 552.108(b)(2) because, even if it did, we cannot conclude that the exception covers the records related to the welfare check in this case. In *City of Fort Worth v. Cornyn*, 86 S.W.3d 320 (Tex. App.—Austin 2002, no pet.), this Court discussed the types of records that are excepted from disclosure under Section 552.108(b). In that case, the issue was whether the PIA authorized the City to withhold information that it had obtained as part of its evaluation of an individual who had applied for employment as a police officer. *Id*. at 321. The City argued that the information was excepted from disclosure under Section 552.108(b)(1), which provides that "an internal record or notation of a law enforcement agency or prosecutor that is maintained for internal use in matters relating to law enforcement or prosecution is excepted from the requirements of [disclosure] if release of the internal record or notation would interfere with law enforcement or prosecution." Tex. Gov't Code § 552.108(b). The City argued that the term "law enforcement" should be broadly construed to encompass information related to law-enforcement hiring decisions. *See City of Fort Worth*, 86 S.W.3d at 325–36.

This Court disagreed and instead narrowly construed "law enforcement," limiting the exception to matters related to "enforcing the law." *Id*. at 326–27. This Court explained that "the exception evidences the Legislature's recognition of the peculiar considerations release of internal police records could have on a police department's ability to *enforce the law*," *id*. at 326, and the Court was unable to conclude that the release of the requested information "would have any effect on the City's ability to enforce the law, at least not in the manner contemplated by the Legislature in enacting section 552.108," *id*. In this Court's view, "a more reasonable interpretation of the statutory language reveals that the type of internal records that could interfere with law enforcement are those that would divulge a police department's methods, techniques, and strategies for preventing and predicting *crime*." *Id*. (emphasis added).

This Court added that by linking the terms "law enforcement" and "prosecution," the Legislature demonstrated an intent "to include within the law enforcement exception only that type of information that relates to violations of the law." *Id*. at 327. The Court explained:

> If, instead of limiting the scope of the law enforcement exception as we do, we accepted the City's argument that any activity engaged in by a police department is exempt from disclosure under section 552.108, we would allow the exception to swallow the rule. Because everything a police department does arguably involves law enforcement, were we to adopt the City's interpretation, none of a police department's records would be subject to disclosure. The more reasoned approach, and the one we adopt, limits section 552.108(b)(1) to that type of information which, if released, would permit private citizens to anticipate weaknesses in a police department, avoid detection, jeopardize officer safety, and generally undermine police efforts to effectuate the laws of this State.

*Id*.

Following the holding in *City of Fort Worth*, we reach a similar conclusion regarding Section 552.108(b)(2). We first observe that the Legislature limited all three exceptions under Section 552.108(b) to "matters relating to law enforcement or prosecution" and then used additional language in each exception demonstrating an intent to restrict the exception to matters related to "enforcing the law" or prosecuting "violations of the law." *See* Tex. Gov't Code § 552.108(b)(1) (excepting from disclosure internal records or notations that "would interfere with *law enforcement or prosecution*"), (2) (excepting from disclosure internal records or notations that "relate[] to law enforcement only in relation to an investigation that did not result in *conviction or deferred adjudication*"), (3) (excepting from disclosure internal records or notations that are "prepared by an attorney representing the state in anticipation of or in the course of preparing for *criminal litigation* or reflect[] the mental impressions or legal reasoning of an attorney representing the state") (emphases added). We conclude that the Legislature, by including the terms "conviction or deferred adjudication" in Section 552.108(b)(2), intended to limit this exception to *criminal* investigations, because only a criminal investigation could result in a person being convicted or placed on deferred adjudication. Thus, for Section 552.108(b)(2) to apply, there must be a criminal investigation that did not result in conviction or deferred adjudication. *See, e.g.*, *City of Carrollton v. Paxton*, 490 S.W.3d 187, 196 (Tex. 2016) (concluding that Section 552.108(b)(2) applied to records relating to "an alleged assault with property damage" that "gave rise to misdemeanor charges that were ultimately dismissed pursuant to an agreement involving payment of restitution").

11

A welfare check is not a criminal investigation. When the police are conducting a welfare check, they are not "enforcing the law" or investigating "violations of the law." Rather, the officers are checking on an individual's well-being. Welfare checks are considered to be within an officer's "community caretaking functions," which are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973); *Byram v. State*, 510 S.W.3d 918, 922 (Tex. Crim. App. 2017). Although a welfare check could, in some situations, evolve into a criminal investigation, depending on what the officers observe during the encounter, *see, e.g.*, *Wright v. State*, 7 S.W.3d 148, 150 (Tex. Crim. App. 1999) (welfare check evolved into narcotics investigation), that is not what occurred here. The record does not indicate that at any point during the welfare check, the officers began investigating "violations of the law."[9] Thus, the welfare check did not result in conviction or deferred adjudication because no person was subject to a criminal investigation in which conviction or deferred adjudication could result.

We hold that records related to welfare checks are outside the scope of Section 552.108(b)(2), absent evidence that the welfare check became a criminal investigation. Thus, the records in this case, which relate solely to a welfare check, are not excepted from disclosure under Section 552.108(b)(2). This construction of the statute is consistent both with this Court's prior decision in *City of Fort Worth* and the statutory requirement that exceptions to disclosure are to be

---

[9] In fact, the Kings acknowledge this in their brief, stating that "at no time did APD treat the matter as a criminal investigation," that "at no point was Mrs. King investigated for, or determined to have committed, a crime," and that, according to the police incident reports, "this incident began, continued, and ended as a mental health welfare check."

"construed narrowly." *See Jackson*, 351 S.W.3d at 299; *City of Fort Worth*, 86 S.W.3d at 326–27; *see also Morales v. Ellen*, 840 S.W.2d 519, 525–26 (Tex. App.—El Paso 1992, writ denied) (concluding that statutory predecessor to Section 552.108 was not applicable to internal investigation of officer's sexual misconduct because "no criminal investigation or prosecution resulted from the investigation"); Tex. Att'y Gen. OR1981-0287 (concluding that statutory predecessor to Section 552.108 was not applicable to record kept by Community Services Division of Dallas Police Department because record "does not concern the detection and investigation of crime" and was associated with police department's provision of social services "rather than more traditional police work"). Accordingly, the district court did not err in failing to apply Section 552.108(b)(2) to the records in this case.

**Section 1701.661(f) of the Texas Occupations Code**

We next address the portion of the district court's ruling that both the Kings and the Attorney General challenge. The district court ordered the withholding of three portions of the audio recordings of Mrs. King's conversations that occurred inside her home, citing to Section 1701.661(f) of the Texas Occupations Code. That provision, which governs the release of information recorded by "body worn cameras," provides in relevant part that "[a] law enforcement agency may not release any portion of a recording made in a private space . . . without written authorization from the person who is the subject of that portion of the recording . . . ." Tex. Occ. Code § 1701.661(f). Thus, the statute prohibits the release of recordings that are made "in a private space" by a "body worn camera," unless the subject of the recording provides written authorization to release the recordings.

13

The Kings argue that because the "J_____MVR" and the "S_____MVR" were made at the Kings' home, the City was required to obtain Mrs. King's written authorization to release the recordings. In the Kings' view, because the City failed to do so, "the City cannot release any portion of the recordings." The Attorney General, on the other hand, argues that Section 1701.661(f) does not apply to any portion of the recordings at issue, not even those made inside Mrs. King's home, because, in the Attorney General's view, the recordings were not made by a "body worn camera."

The statute defines "body worn camera" as "a recording device that is: (A) capable of recording, or transmitting to be recorded remotely, video or audio; and (B) worn on the person of a peace officer, which includes being attached to the officer's clothing or worn as glasses." Tex. Occ. Code § 1701.651(1). According to the Kings, this definition is not limited to devices that record video. The Kings contend that the plain language of the statute "clearly posits alternatives," i.e., devices capable of recording either (1) video; (2) audio; or (3) a combination of both. The Kings further argue that because the recordings at issue were recorded "by cameras that capture video from within a patrol car and audio from microphones on each officer's body," the recordings were created by recording devices that are within the statutory definition of "body worn cameras."

We agree with the Kings and the district court that the plain language of the statute encompasses the recording devices in this case. The statute provides that a "body worn camera" is a recording device "capable of recording, or transmitting to be recorded remotely, video *or* audio." *Id*. § 1701.651(1)(A) (emphasis added). "[T]he Legislature's use of the disjunctive word 'or' is significant when interpreting statutes." *City of Lorena v. BMTP Holdings, L.P.*, 409 S.W.3d 634, 642 (Tex. 2013). The use of "or" between two words or phrases "signifies a separation between two

14

distinct ideas." *Abutahoun v. Dow Chem. Co.*, 463 S.W.3d 42, 49 (Tex. 2015); *Spradlin v. Jim Walter Homes, Inc.*, 34 S.W.3d 578, 581 (Tex. 2000). "Or" is a disjunctive that "separates words or phrases in the alternate relationship, indicating that either of the separated words or phrases may be employed without the other." *Jones v. State*, 175 S.W.3d 927, 932 (Tex. App.—Dallas 2005, no pet.); *see City of Dallas v. TCI W. End, Inc.*, 463 S.W.3d 53, 58 (Tex. 2015) (construing statute authorizing recovery of civil penalties and concluding that "[t]he statute's use of 'or,' a disjunctive, identifies two alternative bases for recovering civil penalties").

Because the Legislature chose to separate the words "video" and "audio" using the disjunctive "or," we agree with the Kings that the definition "clearly posits alternatives." Based on the plain language of the statute, we conclude that a "body worn camera" can be a recording device capable of recording video, a recording device capable of recording audio, or a recording device capable of recording both video and audio, so long as the device is "worn on the person of a peace officer."[10] *See* Tex. Occ. Code § 1701.651(1) Accordingly, the recording devices worn by the officers in this case, which were capable of recording audio, or transmitting audio to be recorded remotely, meet that statutory definition.

The Attorney General argues that this construction of the statute "would lead to absurd results that fail to give effect to the Legislature's intent." According to the Attorney General, "Section 1701.661(f) is part of a recently adopted statutory scheme intended to create statewide standards on the use of body-worn cameras by law enforcement," and the Legislature could not have

---

[10] Consequently, patrol-car dash cameras, such as the ones in this case, do not satisfy the statutory definition, and we disagree with the Kings to the extent that they argue that the video recordings should also be withheld from disclosure under Section 1701.661(f).

15

intended the statute to apply to older, vehicle-based recording technology. The Attorney General and the City of Abilene argue that applying the statute to older, audio-based technology that has existed for many years would be unduly burdensome to cities and law enforcement agencies.

Although we agree that Section 1701.661(f) is part of a statutory scheme intended to create statewide standards for "body-worn cameras," as that term is statutorily defined, we disagree with the contention that the Legislature could not have intended to apply that statutory scheme to older, audio-based technology. The distinction drawn by the Legislature in the statute is not between "newer" and "older" recording devices, but between recording devices that are worn on an officer's body and devices that are not. The statutory definition of "body worn camera" is expressly limited to recording devices that are "worn on the person of a peace officer," Tex. Occ. Code § 1701.651(1)(B), but the definition contains no such limitation on the age of the technology or the type of recording that the device is capable of producing. Instead, the statute applies broadly to recording devices that are "capable of recording, or transmitting to be recorded remotely, video *or* audio." *Id*. § 1701.651(1)(A) (emphasis added). If the Legislature had wanted to limit the definition to newer technology that is capable of recording both video *and* audio on a single device, it could have simply used the word "and" instead of "or." However, that is not what the Legislature wrote. *See Jaster*, 438 S.W.3d at 562 ("We must enforce the statute 'as written' and 'refrain from rewriting text that lawmakers chose.'" (quoting *Entergy Gulf States, Inc.*, 282 S.W.3d at 443)). Similarly, if the Legislature did not want to place an additional burden on cities and law enforcement, it could have limited the definition of "body worn cameras" to video-recording devices. However, according to the plain language of the statute, the Legislature provided no such limitation.

16

The Attorney General claims that this construction of the statute ignores the plain and ordinary meaning of the term "camera," which is defined as "a device that consists of a lightproof chamber with an aperture fitted with a lens and a shutter through which the image of an object is projected onto a surface for recording (as on film) or for translation into electrical impulses (as for television broadcast)." *Camera*, *Merriam-Webster's Collegiate Dictionary* (10th ed. 2000). However, "if a statute defines a term, a court is bound to construe that term by its statutory definition only." *Needham*, 82 S.W.3d at 318; *see* Tex. Gov't Code 311.011(b) ("Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly."); *see also Lewis v. Funderburk*, 253 S.W.3d 204, 207 (Tex. 2008) ("When a statute uses a term with a particular meaning, we are bound by the statutory usage."). Here, the statute defines "body worn camera" as a recording device capable of recording video *or* audio, and we are bound by that definition.

We also disagree that applying the statute to the recording devices worn by the officers in this case would lead to "absurd results." The statute prohibits the release of "any portion of a recording made in a private space . . . without written authorization from the person who is the subject of that portion of the recording." Tex. Occ. Code §1701.661(f). Nothing in the text of the statute limits this prohibition to video recordings. It is not absurd to conclude that audio recordings of police-citizen interactions made in a private space would be included within the scope of the statute. That is particularly true in this case, where the officers, during the course of the welfare check, repositioned their patrol cars so that the video cameras were facing the front porch where Mrs. King was standing and speaking, and then re-approached Mrs. King wearing their audio-recording

17

devices. As a result, the audio recordings served to enhance the video recordings of the patrol-car dash cameras, because when viewing the recordings, one can see *and* hear significant portions of Mrs. King's interactions with the police, in much the same way as one would be able to see and hear the interactions if the officers had been wearing newer devices capable of recording both video and audio. To hold that Section 1701.661(f) applies to such recordings does not create an "absurdity." In fact, it would be absurd to hold the opposite, i.e., that audio recordings of police-citizen interactions, which implicate many of the same privacy concerns as video recordings, are outside the scope of the statute simply because the officer happened to be wearing an older device that was not capable of recording video.

The Texas Supreme Court has explained that "statutes, framed in general terms, can often work peculiar outcomes, including over-or under-inclusiveness, but such minor deviations do not detract from the statute's clear import," and "pointing out a quirky application is quite different from proving it was quite impossible that a rational Legislature could have intended it." *Combs v. Health Care Servs. Corp.*, 401 S.W.3d 623, 630 (Tex. 2013). Defining "body worn cameras" to include recording devices capable of recording audio but not video might be "quirky," but it is not "absurd." We conclude that the recording devices worn by the officers in this case were "body worn cameras" as Section 1701.651(1) defines that term.

However, that does not end our inquiry. For Section 1701.661(f) to apply, the audio recordings must have been made in a "private space." The statute defines a "private space" as "a location in which a person has a reasonable expectation of privacy, including a person's home." Tex. Occ. Code § 1701.651(3). Thus, by the plain language of the statute, a person's home is

18

considered a private space, and the district court did not err in concluding that the audio recordings that were made inside Mrs. King's home should be withheld.

The remaining question is whether the audio recordings that were made on Mrs. King's front porch, where the majority of her interactions with the police occurred, should also be withheld. The statute requires that a person have a "reasonable expectation of privacy" in the location where the recording is made. *Id.* That phrase is most commonly used in cases analyzing the Fourth-Amendment prohibition against unreasonable searches. *See* U.S. Const. amend. IV. "Since *Katz v. United States*, 389 U.S. 347 (1967), the touchstone of [Fourth] Amendment analysis has been the question whether a person has a 'constitutionally protected reasonable expectation of privacy.'" *Oliver v. United States*, 466 U.S. 170, 177 (1984) (quoting *Katz*, 389 U.S. at 360 (Harlan, J., concurring)). "The Amendment does not protect the merely subjective expectation of privacy, but only those '[expectations] that society is prepared to recognize as "reasonable."'" *Id.*

"The Fourth Amendment 'indicates with some precision the places and things encompassed by its protections': persons, houses, papers, and effects." *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (quoting *Oliver*, 466 U.S. at 176). "The Fourth Amendment does not, therefore, prevent all investigations conducted on private property; for example, an officer may (subject to *Katz*) gather information in what we have called 'open fields'—even if those fields are privately owned—because such fields are not enumerated in the Amendment's text." *Id.* (citing *Hester v. United States*, 265 U.S. 57 (1924)).

"But when it comes to the Fourth Amendment, the home is first among equals." *Id.* "At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there

19

be free from unreasonable governmental intrusion.'" *Id*. (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). "This right would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity; the right to retreat would be significantly diminished if the police could enter a man's property to observe his repose from just outside the front window." *Id*.

"We therefore regard the area 'immediately surrounding and associated with the home'—what our cases call the curtilage—as 'part of the home itself for Fourth Amendment purposes.'" *Id*. (quoting *Oliver*, 466 U.S. at 180). "This area around the home is 'intimately linked to the home, both physically and psychologically,' and is where 'privacy expectations are most heightened.'" *Id*. (quoting *California v. Ciraolo*, 476 U.S. 207, 213 (1986)). "Thus, courts have extended Fourth Amendment protection to the curtilage; and they have defined the curtilage, as did the common law, by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private." *Oliver*, 466 U.S. at 180.

The United States Supreme Court has held that "the front porch is the classic exemplar of an area adjacent to the home and 'to which the activity of home life extends.'" *Jardines*, 569 U.S. at 7; *see also Collins v. Virginia*, ___ U.S. ___, 138 S. Ct. 1663, 1671 (2018) (including front porch among "areas adjacent to home" that are "properly considered curtilage"). Accordingly, Mrs. King's interactions with the police on her front porch occurred within the curtilage of her home. Because the statute expressly includes "a person's home" as "a location in which a person has a reasonable expectation of privacy," and the curtilage is considered "part of the home itself for Fourth Amendment purposes," *Jardines*, 569 U.S. at 6–7, Mrs. King's front porch could be a "private

20

space" as that term is defined in the Occupations Code. *See Oliver*, 466 U.S. at 178–81 (contrasting open fields, where there is no reasonable expectation of privacy, with curtilage, where there is some reasonable expectation of privacy); *State v. Betts*, 397 S.W.3d 198, 207 (Tex. Crim. App. 2013) ("The curtilage of a house is protected by the Fourth Amendment."); *see also United States v. Jackson*, 588 F.2d 1046, 1053 (5th Cir. 1979) ("Whenever government agents enter into the curtilage they necessarily intrude upon the individual's reasonable expectation of privacy."); *State v. Davis*, No. 05-15-00232-CR, 2018 Tex. App. LEXIS 2305, at *9 (Tex. App.—Dallas Mar. 29, 2018, pet. ref'd) (op. on remand) ("There is no question a person has a reasonable expectation of privacy in the home and its curtilage."); *Cooksey v. State*, 350 S.W.3d 177, 183 (Tex. App.—San Antonio 2011, no pet.) ("A person has a reasonable expectation of privacy not only in his home, but also in the curtilage of his home.").

This is not to say that a front porch will always be a "private space" for purposes of Section 1701.661(f). In criminal cases involving police searches on private property, courts have held that a person's reasonable expectation of privacy in her home and the surrounding curtilage is not absolute and that there are circumstances in which one does not have a reasonable expectation of privacy in those areas. *See, e.g.*, *Ciraolo*, 476 U.S. at 213–15; *Bower v. State*, 769 S.W.2d 887, 897 (Tex. Crim. App. 1989) (en banc), *overruled on other grounds by Heitman v. State*, 815 S.W.2d 681 (Tex. Crim. App. 1991) (en banc); *Sayers v. State*, 433 S.W.3d 667, 674–75 (Tex. App.—Houston [1st Dist.] 2014, no pet.); *Cooksey v. State*, 350 S.W.3d 177, 184 (Tex. App.—San Antonio 2011, no pet.). However, this is not a criminal case. We are not deciding whether the police violated Mrs. King's reasonable expectation of privacy while searching her front porch for

21

evidence of crime. Rather, the issue is whether, under the circumstances of this case, King's front porch was "a private space" as that term is defined in Section 1701.651(3) of the Texas Occupations Code. We conclude that it was.

In reaching this conclusion, we have reviewed the audio and video recordings of the incident in their entirety, as well as the incident reports and notes prepared by the officers involved. It is true, as observed in the concurring and dissenting opinion, that Mrs. King was "outside her home without a physical barrier between her location and the street." However, before the police arrived at her home that night, at approximately 9:00 p.m., Mrs. King was inside her home, alone. When the police knocked on her door, she did not answer. Instead, she called 911 to report what she believed to be a burglary. While Mrs. King was on the phone, the police walked around her property and knocked on her side door, which caused her further distress. During the call, the 911 dispatcher advised Mrs. King that the people knocking on her door were police officers and told her to open the door. According to the notes of Officer "J," Mrs. King "stopped communicating with dispatch at that time and still refused to answer the door." Then, Officer "J" recalled, "dispatch re-contacted Mrs. King," "advised her that there were officers at her door," and asked her to "please step out." Eventually, Mrs. King complied. According to the notes of another officer, "the lighting conditions were very low" outside the front door. Therefore, as Mrs. King stepped outside, this officer instructed the other officers to "illuminate" Mrs. King "with flashlights and they did so."

Although Mrs. King was now outside her home, it is clear from the recordings that she did not want to be there and did not want the officers to be there. Mrs. King can be heard repeatedly telling the officers to "get off of [her] property." They refused. At the same time, the

22

officers had restricted Mrs. King's movements by handcuffing her, attempting to make her sit still on a bench on the porch, and refusing to let her go back inside her home without their supervision. It is undisputed that at no point during the incident was Mrs. King free to end the encounter with the police. It is also undisputed that Mrs. King did not want the officers on her porch and wanted them to leave her alone, but the officers refused to leave until she agreed to accompany them to a location where her mental health could be evaluated.

Under these circumstances, we conclude that Mrs. King had a reasonable expectation of privacy on her front porch, making it a "private space" for purposes of Section 1701.661(f) of the Texas Occupations Code. Thus, the audio recordings of Mrs. King's interactions with the police on the front porch of her home should also be withheld, and the district court erred in concluding otherwise. Specifically, the audio recording of the "S_____MVR," beginning at 00:20:35 and continuing until the end of the recording, should be withheld, as should the audio recording of the "J_____MVR," beginning at 00:20:15 and continuing until 02:13:00.

**Section 611.002 of the Texas Health and Safety Code**

Citing to Section 611.002 of the Texas Health and Safety Code, the district court also ordered the City to withhold from disclosure three audio portions of the recordings in which Mrs. King can be heard speaking with a mental-health professional. The Attorney General does not challenge this decision. However, the Kings contend that Section 611.002 "protects all of the information at issue."

Section 611.002 provides that "[c]ommunications between a patient and a professional, and records of the identity, diagnosis, evaluation, or treatment of a patient that are

23

created or maintained by a professional, are confidential" and that "[c]onfidential communications or records may not be disclosed" unless certain statutory procedures are followed. Tex. Health & Safety Code § 611.002(a), (b). The statute defines "patient" as "a person who consults or is interviewed by a professional for diagnosis, evaluation, or treatment of any mental or emotional condition or disorder, including alcoholism or drug addiction." The statute further defines "professional" as "(A) a person authorized to practice medicine in any state or nation; (B) a person licensed or certified by this state to diagnose, evaluate, or treat any mental or emotional condition or disorder; or (C) a person the patient reasonably believes is authorized, licensed, or certified as provided by this subsection." *Id*. § 611.001(2). No evidence in the record shows that any of the law-enforcement officers were authorized to practice medicine or that they were "licensed or certified by this state to diagnose, evaluate, or treat any mental or emotional condition or disorder." However, the Kings contend that Mrs. King reasonably believed that the law-enforcement officers with whom she was speaking during the welfare check were "authorized, licensed, or certified" to provide a mental-health evaluation.

The record does not support this contention. Although the law-enforcement officers made it clear to Mrs. King that they had arrived in response to a call concerning her well-being, at no point during the incident did the officers suggest, either through their words or conduct, that they themselves were capable of evaluating her mental health. When the officers first arrived, Mrs. King did not know why the officers were there or who had called them, and the officers informed her that they were not allowed to tell her who had called. Mrs. King became increasingly upset as the incident went on, and the officers were focused on trying to calm her down rather than evaluate her

mental health. Also, Mrs. King's words and conduct during the incident, in which she expressed anger and frustration at the officers, suggest that she believed the officers were there to detain her rather than evaluate her. The officers behaved in a manner that would support this belief, in that they placed Mrs. King in handcuffs, initially threatened to "tase" her if she did not calm down, and refused her repeated requests to remove the handcuffs or let her back into her home without their supervision. These were not circumstances indicative of a professional mental-health evaluation. Moreover, the officers informed Mrs. King that they wanted to transport her to a location where her mental health could be evaluated, which would further suggest to Mrs. King that the officers themselves were not capable of providing such an evaluation. Under the circumstances in this case, it would not have been reasonable for Mrs. King to believe that the police officers were "authorized, licensed, or certified" to evaluate her mental health. Accordingly, the district court did not err in limiting the applicability of Section 611.002 to Mrs. King's recorded conversations with the mental-health professional.

**Constitutional, common-law, and statutory rights to privacy**

Finally, we address the applicability of the Kings' constitutional, common-law, and statutory privacy rights to the information at issue. Both the Attorney General and the district court found that some of the information at issue should be withheld under the doctrine of common-law privacy. However, the Kings contend that all of the information should be withheld. The Attorney General argues in response that the Kings "have failed to demonstrate any additional redaction is supported by law."

25

We begin with the privacy rights that are protected by the United States Constitution. "Although '[t]he Constitution does not explicitly mention any right of privacy,' the Court has recognized that one aspect of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment is 'a right of personal privacy, or a guarantee of certain areas or zones of privacy.'" *Carey v. Population Servs. Int'l*, 431 U.S. 678, 684 (1977) (quoting *Roe v. Wade*, 410 U.S. 113, 152 (1973)). The constitutional right to privacy protects "at least two different kinds of interests. One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." *Whalen v. Roe*, 429 U.S. 589, 599–600 (1977). The former interest, which the Texas Supreme Court has characterized as "disclosural privacy," *Industrial Found. of S. v. Texas Indus. Accident Bd.*, 540 S.W.2d 668, 679 (Tex. 1976), is at issue here.

The right of "disclosural privacy" is the "right to control information" within "zones of privacy" that the United States Supreme Court has deemed "fundamental" or "inherent in the concept of ordered liberty." *Id*. at 679–80. These "zones of privacy" include "matters relating to marriage, procreation, contraception, family relationships, and child rearing and education." *Id*. at 680–81. The Texas Supreme Court has described this right as follows:

> [E]ffective protection of the fundamental "zones of privacy" . . . necessarily implies a concomitant right to prevent unlimited disclosure of information held by the government which, although collected pursuant to a valid governmental objective, pertains to activities and experiences within those zones of privacy. The individual does not forfeit all right to control access to intimate facts concerning his personal life merely because the State has a legitimate interest in obtaining that information. Just as the State's intrusion into the individual's zones of privacy must be carefully limited, so must the State's right to reveal private information be closely scrutinized as well.

26

*Id*. at 679.

"It is also clear, however, that not every publication of intimate or embarrassing information about an individual constitutes an invasion of a constitutionally protected zone of privacy." *Id*. at 680. "[T]he State's right to make available for public inspection information pertaining to an individual does not conflict with the individual's constitutional right of privacy unless the State's action restricts his freedom in a sphere recognized to be within a zone of privacy protected by the Constitution." *Id*. at 680–81. Thus, only information that concerns matters "relating to marriage, procreation, contraception, family relationships, or child rearing and education," is excepted from disclosure. *Id.* at 681.

We have reviewed the information at issue and found several unredacted references to the Kings' marriage and family relationships in the APD incident reports. We conclude that this information falls within the "zones of privacy" identified by the United States Supreme Court and should therefore be redacted from the reports. Specifically, the following information should be redacted prior to disclosure of the reports:

- Page 4, Paragraph 4, First sentence of incident report, beginning with, "During this incident . . . ."

- Page 5, Paragraph 1, Fourth sentence of incident report, beginning with, "Ms. King . . . ."

- Page 5, Paragraph 3, Fourth sentence of incident report, beginning with, "She was asked . . . ."

- Page 6, Paragraph 2, Second sentence of incident report, beginning with, "Lewis identified . . . ."

- Page 6, Paragraph 2, Fourth sentence of incident report, beginning with, "Lewis contacted . . . ."

- Page 6, Paragraph 3, Third sentence of incident report, beginning with, "On that date . . . ."

- Page 6, Paragraph 4, First sentence of incident report, beginning with, "1. On 10/10/15 . . . ."

- Page 6, Paragraph 6, First sentence of incident report, beginning with, "3. Lewis also . . . ."

- Page 6, Paragraph 7, Third sentence of incident report, beginning with, "Apparently Austin . . . ."

- Page 7, Paragraph 7, Third, fourth, fifth, and sixth sentences of incident report, beginning with, "At 2247 hrs. . . ."[11]

We next address the Kings' common-law privacy rights. The common law right to privacy protects information from disclosure when "(1) the information contains highly intimate or embarrassing facts the publication of which would be highly objectionable to a reasonable person, and (2) the information is not of legitimate concern to the public." *Id*. at 685. The Texas Supreme Court derived these requirements from the common-law tort of invasion of privacy, thereby incorporating the elements of that cause of action into the test. *See id*. at 682–83 (citing *Billings v. Atkinson*, 489 S.W.2d 858 (Tex. 1973); W. Prosser, Law of Torts § 117, p. 809 (4th ed. 1971)). If the disclosure of information by a governmental body would give rise to a tort action for invasion of the right of privacy, then the requested information is excepted from disclosure. *See id*.; *see also* Tex. Gov't Code § 552.101("Information is excepted from the requirements of [disclosure] if it is

---

[11] These sentences are in addition to the second sentence of Paragraph 7, which the district court has already ordered to be redacted.

28

information considered to be confidential by law, either constitutional, statutory, or by judicial decision.").

"The first requirement for wrongful publication of private information is that the information contain highly intimate or embarrassing facts about a person's private affairs, such that its publication would be highly objectionable to a person of ordinary sensibilities." *Id*. at 683. Information that is "highly intimate or embarrassing" includes information concerning sexual assault, pregnancy, illegitimacy, mental or physical abuse, contraception, psychiatric treatment, injuries to genitalia, and attempted suicide. *See id*.

"If the information meets the first test, it will be presumed that the information is not of legitimate public concern unless the requestor can show that, under the particular circumstances of the case, the public has a legitimate interest in the information notwithstanding its private nature." *Id*. Whether information is of legitimate concern to the public "can only be considered in the context of each particular case, considering the nature of the information and the public's legitimate interest in its disclosure." *Id*. "There may be circumstances in which the special nature of the information makes it of legitimate concern to the public even though the information is of a highly private and embarrassing nature." *Id*.

Having reviewed the information at issue, we cannot conclude that the disclosure of any additional information—beyond that which has already been ordered to be redacted or withheld from disclosure by the Attorney General, the district court, and this Court—would violate the Kings' common-law privacy rights. First, the remaining information does not rise to the level of "highly intimate or embarrassing facts the publication of which would be highly objectionable to a

reasonable person." *Id*. at 683. Although it is clear from the record that Mrs. King's interaction with the police that night was stressful and upsetting for her, that does not make the encounter "highly intimate or embarrassing." Many police–citizen encounters at a person's home are stressful and upsetting. We agree with the Attorney General that to broadly construe common-law privacy to encompass stressful interactions with the police "would allow the exception to swallow the rule" and be contrary to our mandate to narrowly construe exceptions to disclosure.

Moreover, we disagree with the Kings' assertion that the remaining information "is not of legitimate concern to the public." Whether information "addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147–48 (1983). Information "deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (internal citations omitted). In the context of the invasion-of-privacy tort, this is sometimes referred to as the "newsworthiness" defense, as it allows for the publication and broadcast of "news or other matters of public interest." *Anonsen v. Donahue*, 857 S.W.2d 700, 703 (Tex. App.—Houston [1st Dist.] 1993, writ denied). "The privilege is broad and extends beyond subjects of political or public affairs to all matters of the kind customarily regarded as 'news' and all matters giving information to the public for purposes of education, amusement or enlightenment, where the public may reasonably be expected to have a legitimate interest in what is published." *Id*. (citing *Virgil v. Time, Inc.*, 527 F.2d 1122, 1127 (9th Cir. 1975)). Information that is newsworthy can include "private

30

facts" concerning an individual. *See Star-Telegram, Inc. v. Doe*, 915 S.W.2d 471, 474 (Tex. 1995);

*see also Virgil*, 527 F.2d at 1129. As the United States Supreme Court has explained,

> The guarantees for speech and press are not the preserve of political expression or comment upon public affairs, essential as those are to healthy government. One need only pick up any newspaper or magazine to comprehend the vast range of published matter which exposes persons to public view, both private citizens and public officials. Exposure of the self to others in varying degrees is a concomitant of life in a civilized community. The risk of this exposure is an essential incident of life in a society which places a primary value on freedom of speech and of press.

*Time, Inc. v. Hill*, 385 U.S. 374, 388 (1967). Additionally, information regarding the behavior of

public officials, including elected officeholders and police officers, is often considered newsworthy

due to the officials' status as "public servants" in the community. *See Garrison v. Louisiana*, 379

U.S. 64, 77 (1964) ("The public-official rule protects the paramount public interest in a free flow of

information to the people concerning public officials, their servants. To this end, anything which

might touch on an official's fitness for office is relevant."); *see also Rosenblatt v. Baer*, 383 U.S. 75,

85 (1966) ("It is clear, therefore, that the 'public official' designation applies at the very least to

those among the hierarchy of government employees who have, or appear to the public to have,

substantial responsibility for or control over the conduct of governmental affairs."); *Forsyth v. City*

*of Dallas*, 91 F.3d 769, 773–74 (5th Cir. 1996) (information concerning relationships between

"influential citizens" and police officers considered matter of public concern); *Brady v. Klentzman*,

515 S.W.3d 878, 884 (Tex. 2017) (concluding that police chief's response to officers who ticketed

his son was matter of public concern); *Godbehere v. Phoenix Newspapers*, 783 P.2d 781, 789–90

31

(Ariz. 1989) (collecting cases classifying "police and other law enforcement personnel" as public officials).

However, "[w]hile the general subject matter of a publication may be a matter of legitimate public concern, it does not necessarily follow that all information given in the account is newsworthy." *Star-Telegram, Inc.*, 915 S.W.2d at 474. In order for information to be disclosed, there must be a "logical nexus" between "the private facts disclosed" and "the general subject matter" that is of public concern. *Id.*

We conclude that there is such a "logical nexus" in this case. At the time KTXS sought the information at issue, Mrs. King was a state representative for Abilene and the surrounding area who had announced her intention to run for the Texas Senate. The requested information concerns interactions between Mrs. King, an influential citizen in the community, and multiple police officers in that same community, during an official "welfare check" that was initiated by a police officer who personally knew Mrs. King. Under these circumstances, we conclude that the events leading to the initiation of the welfare check, the police conduct during that welfare check, and Mrs. King's reaction to the police conduct are all matters of legitimate public concern. The information that is not a matter of legitimate public concern has already been ordered to be redacted from the records. Accordingly, we conclude that the district court did not err in refusing to order the City to withhold from disclosure the remaining information at issue under the doctrine of common-law privacy.

Finally, the Kings further assert that the information at issue should be excepted from disclosure under Section 552.109 of the Texas Government Code, which provides that "[p]rivate

correspondence or communications of an elected office holder relating to matters the disclosure of which would constitute an invasion of privacy are excepted from the requirements of [disclosure]." Tex. Gov't Code § 552.109. However, the standard to be applied to the disclosure of information under this provision is the same as the common-law privacy standard formulated in *Industrial Foundation*. *See* Tex. Att'y Gen. OR2018-29665, at *7–8. Accordingly, for the same reasons that the district court did not err in refusing to order the City to withhold the remaining information at issue under common-law privacy, it did not err in refusing to order the City to withhold it under Section 552.109.

**CONCLUSION**

In light of the foregoing, we reverse in part the district court's summary judgment and render judgment that the City of Abilene withhold additional information from disclosure, specifically: (1) the audio recording of the "S_____MVR," beginning at 00:20:35 and continuing until the end of the recording; (2) the audio recording of the "J_____MVR," beginning at 00:20:15 and continuing until 02:13:00; and (3) the portions of the police incident reports that reference the Kings' marriage and family relationships, as indicated on pages 27–28 of this opinion. We affirm the district court's summary judgment in all other respects.

_____

Gisela D. Triana, Justice

Before Justices Goodwin, Baker, and Triana
     Concurring and Dissenting Opinion by Justice Goodwin

Affirmed in Part; Reversed and Rendered in Part

Filed:   June 6, 2019